ROCHEZ BROS. INC., a Pennsylvania corporation, Plaintiff,

v.

Charles R. RHOADES et al., Defendants.

Civ. A. No. 68–1048.

United States District Court, W. D. Pennsylvania.

Jan. 24, 1973.

Ralph German, Pittsburgh, Pa., for Rochez Bros. Inc.

W. Gregg Kerr, Pittsburgh, Pa., for Rhoades.

Edmund S. Ruffin, Pittsburgh, Pa., for M. S. & R. Inc.

## OPINION

DUMBAULD, District Judge.

This is an action alleging violation of Rule 10b–5 promulgated by the Securities and Exchange Commission. (A claim for fraud under Pennsylvania law is annexed on the theory of pendent

jurisdiction.[1]) That rule reads as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

in connection with the purchase or sale of any security.[2]

It was originally adopted on May 21, 1942, as Rule X–10B–5, borrowing language from § 17(a) of the Securities Act of May 27, 1933 [3] and applying it "in connection with the purchase or sale of any security." [4]

The rule was purportedly in pursuance of Section 10(b) of the Securities Exchange Act of June 6, 1934, which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.[5]

As will be seen in due course, an extensive judicial gloss has encrusted these texts, with the result that "A startling variety of everyday transactions have turned out to be 'fraudulent' under SEC Rule 10b–5." [6] The interpretative transmutation has been so extensive that "Rule 10b–5 no longer means what it says. This is a signal failing in any positive law." [7]

The rule was extemporized by two SEC employees who wanted to do something about a Boston executive who was buying up his company's stock by telling the owners that the company was doing badly, whereas in fact the earnings had quadrupled.[8] Thus "the archetypal 10b–5 case is the purchase by one group in a closed corporation of the interest of another, without disclosing negotiations

1. See Hurn v. Oursler, 289 U.S. 238, 246, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); UMWA v. Gibbs, 383 U.S. 715, 722–727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

2. 17 C.F.R. § 240.10b–5.

3. It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 48 Stat. 74, 84–85; 15 U.S.C. § 77q.

4. Louis Loss, Securities Regulation (2nd ed. 1961), III, 1426–27.

5. 48 Stat. 881, 891; 15 U.S.C. § 78j(b).

6. Alan R. Bromberg, Securities Law: Fraud, (1967), I, sec. 1.1, p. 3 [1971].

7. Bromberg, II, sec. 12.9, p. 283.

8. Bromberg, I, sec. 2.2 (410), (420), pp. 22.6–22.7 [1970]. For the example involved, see Bromberg, II, App.D., pp. 305–313.

for sale or other disposition of the issuer's assets or its securities at a higher price." [9]

■ Originally, only administrative enforcement was contemplated. But now it is clear that the seller as well as the buyer may bring a civil action.[10] The pioneer holding to this effect was a decision by the late distinguished Judge Kirkpatrick in Kardon v. National Gypsum Co., 69 F.Supp. 512, 513–514 (E.D. Pa.1946). It is noteworthy that in this field of the law leadership has been manifested by District Judges (especially in the Southern District of New York) but that the Supreme Court has made few pronouncements on the subject.[11]

■ It is clear that mere mismanagement or violation of a fiduciary duty under state corporation law does not violate the rule.[12] There must be use, "in connection with the purchase or sale" of a security, of information, accessible to a corporate "insider" for limited fiduciary purposes, but used instead for personal economic advantage, to the detriment of a party to the transaction not having access to such information.[13] The information must be such as would have influenced the uninformed party's decision with respect to the transaction.[14] Information equally accessible to both parties, or which the other party in fact knows or should have known, need not be disclosed.[15] Mere speculations or opinions as to present value or future earnings do not constitute violations, as such differences are the life of the stock market as well as of horse races, and parties are relegated to their own judgment in such matters; but an opinion insincerely professed can have the consequences of a misstatement of fact,[16]

9. Bromberg, I, sec. 4.2, p. 70.

10. Bromberg, I, sec. 2.2 (333), p. 22.4 [1970]; S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 867, 884 (C.A. 2, 1968); Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 543 (C.A. 2, 1967); Royal Air Properties v. Smith, 312 F.2d 210, 212–214 (C.A. 9, 1962); Northern Trust Co. v. Essaness Theatres Corp., 103 F.Supp. 954, 965 (N.D.Ill.E.D.1952); Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 787 (C.A. 2, 1951); Slavin v. Germantown Fire Ins. Co., 174 F.2d 799, 805, 814 (C.A. 3, 1949).

11. Bromberg, II, sec. 12.1 p. 266; S.E.C. v. National Securities, Inc., 393 U.S. 453, 465, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). An interesting case involving Rule 10b–5 in the context of proxy materials was recently decided by the Court of Appeals for the Third Circuit, Kohn v. American Metal Climax, Inc., 458 F.2d 255 (C.A. 3, 1972).

12. Supt. of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 545 (C.A. 2, 1967); O'Neill v. Maytag, 339 F.2d 764, 767–768 (C.A. 2, 1964); Bromberg, I, sec. 4.7, pp. 83–88.2 [1968].

13. Speed v. Transamerica Corp., 99 F.Supp. 808, 828–829 (D.Del.1951) [approved in 235 F.2d 369, 373 (C.A. 3, 1956)]; Kohler v. Kohler Co., 319 F.2d 634, 637–638, 642 (C.A. 7, 1963); S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (C.A. 2, 1968); Schine v. Schine, 250 F.Supp. 822, 824, 826 (S.D.N.Y. 1966).

14. List v. Fashion Park, 340 F.2d 457, 462–463 (C.A. 2, 1965). This case is the subject of a good annotation on "Corporate Insider's Nondisclosure of Information to Seller or Purchaser of Corporation's Stock as Manipulative or Deceptive Device Prohibited by § 10(b)" in 22 A.L.R.3d 793–807. See also Rogen v. Ilikon Corp., 361 F.2d 260, 266–267 (C.A. 1, 1966); and Janigan v. Taylor, 344 F.2d 781, 785 (C.A. 1, 1965); Reed v. Riddle Airlines, 266 F.2d 314, 315 (C.A. 5, 1959).

15. Myzel v. Fields, 386 F.2d 718, 736 (C.A. 8, 1967); Bromberg, II, sec. 8.4 (651) (1).

16. Bromberg, I, sec. 5.3, p. 97. "The mere fact that a forecast is inaccurate does not make it fraudulent, and a margin for error is recognized." Ibid., p. 98, citing S.E.C. v. R. A. Holman & Co., 366 F.2d 456, 457–458 (C.A. 2, 1966). According to the annotation in 22 A.L.R. 3d 793, 797: "mere expectations or hopes are not material facts, even if they materialize later, but . . . nondisclosure of events which had occurred already or the happening of which had been definitely decided upon is a material fact if it can be shown to have had an effect on the decision of the other party

since the state of a person's mind is as much a fact as the state of his digestion, as an English judge once remarked.[17]

In applying the foregoing body of judicially created legal precepts, in order to determine whether plaintiff has established a violation of Rule 10b–5 by defendant, it will be necessary to scrutinize the facts developed in the record, during 18 trial days.

This case arises out of the business activities of defendant Charles R. Rhoades, whose blunt staccato speech resembles that of a military officer, and who is said to be a hard-driving executive. (Tr. 1604–1605). He is of litigious disposition and also has a special aptitude for dissension with his business associates (Tr. 1679, 1694–1695). When evicted from his office with Mason, Shaver, and Rhoades he occupied space in plaintiff's office. (Tr. 23–25). Later an arrangement was made whereby plaintiff and defendant each acquired half ownership of the stock of that company, and the name was changed to MS&R Inc. Plaintiff paid $272,500 for its share on July 1, 1964 (Tr. 30–31). Rhoades was president and director of the company, Joseph Rochez (president of plaintiff) was vice president and director, and George McClaran, of Pittsburgh National Bank, was the third director. (Tr. 31–32).

Rhoades was a sanguine plunger and promoter, a salesman type. Rochez was shrewd and suave, a financier type. (Tr. 1794). Rhoades would occasionally book business and get a disproportionate advance in progress payments from the customer to carry the expenses arising out of performance of the contract. (Tr. 176–178). Rochez complained of lack of working capital, and disfavored overextension. But he was unwilling for plaintiff to supply unilaterally the needed capital (except for small urgent needs), and Rhoades was unwilling or unable to furnish his share (Tr. 43, 47).

A contract with Babcock & Wilcox was one of the chief bones of contention. This was a large order which required considerable expense on the part of MS&R for equipment and materials in order to perform the contract. (Tr. 1336–39). Rochez vigorously opposed taking on the contract, and upon learning that counsel considered the contract to be binding, he caused his protest to be entered in the minutes for his protection as a director. (DX 15 and 16, Tr. 155–157, 306–307).

Rhoades regarded the contract as the opening wedge to future profitable business and declared he would personally undertake the commitment if MS&R declined it (DX–97). At a directors' meeting of September 8, 1967, Western Pennsylvania National Bank (WPNB) undertook to make loans of $600,000 to MS&R, with an unsecured line of credit of $200,000, replacing Pittsburgh National Bank (PNB) as the company's lender. After some controversy, the resignation of McClaran as a director was accepted (DX–98). No further meetings were held until after the sale of Rochez stock to Rhoades.

On May 2, 1965, plaintiff moved its offices into the MS&R premises and consolidated accounting continued until April 30, 1967, when separate accounting was resumed and physical removal of plaintiff's employees took place on August 19, 1967.

The dissension was such that both Rochez and Rhoades interviewed prospective purchasers of the company. They also discussed a buy-sell agreement whereby one of them would buy out the other's interest. (A restriction prevented sale to outsiders without first offering it to the other stockholder. DX–4, Tr. 1693).

In pursuance of this plan plaintiff finally named the price for which it was willing to sell its stock to defendant. On September 16, 1967, an agreement of

---

to the transaction, acting as a reasonable person." See also Kohler v. Kohler Co., 319 F.2d 634, 640 (C.A. 7, 1963).

17. Lord Bowen in Edgington v. Fitzmaurice, 29 Ch.D. 459, 483 (1885).

sale was executed, under which Rhoades bought plaintiff's stock for $598,000 (PX–9). The closing, and delivery of the stock certificates to defendant, took place on November 13, 1967 (Tr. 92).

When plaintiff on September 11, 1967, stated its terms, one of them was that the deal should be concluded by noon on September 15th, and that Rhoades should put $50,000 in escrow, to be forfeited if the closing did not take place on September 29th.[18] (DX–56). Rhoades borrowed that sum from WPNB, and later borrowed the remainder of the purchase price from the same bank. His well-to-do cousin Edward C. McCormick, Jr., would have furnished the money to pay for the Rochez stock if Rhoades had been unable to borrow it from the bank. (Tr. 1533–1535, 1675).

It is fair to assume that Rochez knew that Rhoades would have to borrow the money from a bank or "from other investors that he may have had in the wings." Plaintiff did not care where the money came from "as long as we got our price." (Tr. 385–386).

In February of 1968 Joseph Rochez received a phone call from one Wingate Royce, who claimed that Rhoades had employed him to find a purchaser for MS&R, that Royce had found a ready, willing, and able purchaser, and had earned his commission or finder's fee, but that Rhoades would not go through with the deal or pay (Tr. 96–97). Royce in fact sued Rhoades; Rhoades paid Royce some money under some other pretext without admitting liability; and the suit was withdrawn (Tr. 1702–1704).

From the tale unfolded to him by Royce Rochez obtained documents and information which led to the present litigation (Tr. 101).

It is now clear that in fact Rhoades did answer an advertisement and Royce visited the MS&R plant on April 21, 1967, and was introduced by Rhoades to Rochez. Rochez disdained hiring Royce to find a purchaser for MS&R, but on that very day Rhoades signed a letter to Royce employing him to find a purchaser. (PX–3)

Thereafter, in April of 1967, Royce brought MS&R as a potential acquisition to the attention of J. Walter English, of Simmonds Precision Products Co. (Tr. 1150). In May of 1967 English visited MS&R (Tr. 860–862, 1151) after Royce had informed Rhoades that Simmonds was a possible purchaser. According to Rhoades, he told Royce *ex industria* that he was not interested in acquisition discussions, but agreed to see English as a possible customer for MS&R products (Tr. 1686–1688). However, the testimony of English shows that Simmonds was interested in the prospect of acquiring MS&R (Tr. 1150–1151); and that Rhoades knew it.

In late August or early September, 1967, Rhoades and Wendell E. Hager (his production assistant) visited a Simmonds plant near Hartford and dined with Simmonds personnel. On the return trip to Pittsburgh they rode with Geoffrey Simmonds in the latter's company plane. Simmonds toured the MS&R plant en route to a further destination. Upon arrival at the Hartford airport Rhoades telephoned his Pittsburgh attorney's office to learn how the buy-sell negotiations with plaintiff were progressing. (Tr. 1296, 1298, 1303–1306, 1722–1727). Rhoades maintains, unconvincingly, that these contacts had nothing to do with acquisition of MS&R.

Another improbable story is the version given by Rhoades of his dealings with Carus Chemical Company. Though admitting that Royce had informed him of the interest of Carus in acquiring MS&R stock, he insists that visits of the Carus brothers to the MS&R plant were merely to look at the computer system

---

18. Tr. 1895–1897. By agreement, the time for closing was later extended to December 12th (Tr. 380). Plaintiff's haste to close the deal may be taken into consideration in determining the appropriate scope of disclosure. Kohler v. Kohler Co., 319 F. 2d 634, 638, 642 (C.A. 7, 1963).

employed by MS&R (Tr. 1689–92). This used a standard IBM computer (Tr. 1709). Royce was adviser on acquisitions for the Carus Company, and (to avoid conflict of interests) would have taken no commission from Rhoades if the sale of MS&R had been made to Carus (Tr. 591). The visit by the Carus brothers took place in the latter part of August, 1967 (Tr. 1705). At that time they told Rhoades Carus would be interested in purchasing MS&R stock (Tr. 1708).

Perhaps somewhat like the layman's view that a contract written in lead pencil is not binding, or the ostentatious ostracism by a corporate sales manager of his opposite number in a competitor firm while they are sitting in the grand jury anteroom waiting to testify in an anti-trust investigation, is the attitude assumed by Rhoades with respect to acquisition negotiations. He seemed to think that newsworthy events ceased to exist upon his disclaimer of interest in them. Although the potential purchasers expressed interest in MS&R, Rhoades considered their interest as non-existent because he had obtained offers of financial support from his cousin and did not need to follow up the leads unearthed by Royce (Tr. 1686, 1708). Nevertheless, the fact that such interest existed on the part of potential purchasers would certainly be a factor affecting the value of MS&R stock in the mind of a reasonable man, and hence a matter required to be disclosed under Rule 10b–5. (See note 14, *supra*). This was not the type of information available from the company books and records. The financial sophistication of Joseph Rochez would be of no avail in the absence of such knowledge.[19] With respect to such matters, although an "insider" by virtue of his position in MS&R, Rochez would be an "outsider."

Upon conclusion of the agreement of September 16, 1967, for the purchase of the Rochez stock, Rhoades considered himself the complete owner of the company. After that date he felt no duty to disclose anything to plaintiff, but did not base this view on any specific advice of counsel (Tr. 1714, 1747–48). He promptly began earnest and diligent efforts to dispose of MS&R. On September 18, 1967, he telephoned both Simmonds and Carus (Tr. 1735). The Carus offer was unattractive to Rhoades as it in substance would have required him to earn the purchase price himself out of future profits (Tr. 555–556, 888, 1697–1698). The Simmonds offer fell through both because it was unattractive taxwise to Rhoades, and because Simmonds did not wish to become involved in a possible lawsuit with the Rochez interests. (Tr. 1181–1183, 1188–1189, 1199–1200, 1453–1454, 1742–1743, 1815). The Simmonds offer contemplated exchange of restricted ("lettered") stock of Simmonds for MS&R stock (Tr. 874, 1659).

In April of 1968, through the good offices of WPNB, Rhoades began negotiations with Esterline Corporation (Tr. 625–626), which were consummated by a formal agreement of July 16, 1968 (PX–22). Besides an employment contract (Tr. 1799), Rhoades (and two others to whom he had sold some MS&R stock) received $4,250,000 in cash together with 50,000 shares of Esterline restricted stock (Tr. 1241–1242, 1770, 1773).

In view of the foregoing facts, showing nondisclosure of material information by defendant (with respect to the Simmonds and Carus dealings) before September 16, 1967, it is not necessary to determine the validity of defendant's contention that September 16, 1967, rather than November 13, 1967, is the critical date. If it were necessary to decide, we would be inclined to follow Radiation Dynamics v. Goldmuntz, 464 F. 2d 876, 890–891 (C.A.2, 1972).

---

19. As Justice Brandeis insisted, "knowledge is the basis of wise business action." Alpheus T. Mason, Brandeis: A Free Man's Life (1946) 123. No opinion can be any better than the facts upon which it is based.

While it is true that Rule 10b–5 speaks broadly of fraud "in connection with" the purchase or sale of any security, and events even after the date of transfer of the certificates might well be relevant to demonstrate fraud in the transaction,[20] and it is also true that the date of transfer would be controlling in a case for recapture of short-swing profits,[21] it seems common sense to treat the binding commitment to sell with some degree of finality. Theoretically, a nice conflict of maxims might require evaluation: the rule that equity regards as done that which ought to be done, on the one hand, and, on the other, the "bad man" theory of Justice Holmes[22] that would regard the obligation of a contract as merely the liability to pay damages for its breach, which might well be less than the profitability of non-performance.

It is also unnecessary, in the view we take of the case, to attribute the weight which plaintiff does to defendant's failure to furnish to plaintiff certain financial forecasts prepared by defendant. It is true that many business men have developed through experience and training an extreme precision in their ability to predict with accuracy the results of business operations. Nevertheless, on the whole, such anticipations lack the certitude of historical fact. Many a slip can occur betwixt cup and lip. Expectations, rather than accomplishments, are recorded in such figures.[23]

The testimony here discloses that the use of such financial tools as an aid to management was better known to plaintiff than to defendant. Defendant first saw such a forecast on the desk of Harold E. Cline, an employee of plaintiff. He regarded this forecast as too pessimistic, and made changes in it, which he submitted to plaintiff. (Tr. 924–925, 1019–1021). Thereafter defendant prepared other similar documents, which reflected various assumptions and hypotheses which he envisaged. Apart from his own instruction and amusement, defendant used these "optimistic" forecasts as sales propaganda and furnished them to bankers from whom he was seeking to borrow and to prospective purchasers of the company's stock. He admitted that they were "optimistic" rather than "conservative" predictions.

That defendant was more rosy in his views of the prospects of MS&R than was Joseph Rochez is a notorious fact. Rochez was shocked to hear Rhoades name a high figure as the value of the company when talking on the phone to a prospective purchaser. (Tr. 256–257). Rochez was much more conservative and down to earth in his appraisal of the company's condition. He was much more concerned than Rhoades over the need of money to pay bills as they came due, and of compliance with the company's obligations to its bank. At board meetings Rhoades enunciated optimistic views which Rochez scorned. We are unable to believe that if Rhoades had communicated these optimistic forecasts to Rochez the latter would have viewed them other than with his customary "incredulity" or would have put any credence in them or relied upon them in determining the price to ask for plaintiff's stock.[24]

---

20. See Strong v. Repide, 213 U.S. 419, 433, 29 S.Ct. 521, 53 L.Ed. 853 (1909). Hence, defendant's oft-repeated and standing objection to all evidence of events after September 16, 1972, was properly overruled.

21. As in Brenner v. Career Academy, 467 F.2d 1080, 1084–1085 (C.A. 7, 1972).

22. Holmes, Collected Legal Papers (1920) 173–175. See also Moorfield Storey, The Reform of Legal Procedure (1911) 32–33.

23. The fallibility of forecasting is emphasized in two recent discussions: Bruce D. Henderson, "Generally Accepted Forecasting Principles," Harvard Law School Record, Dec. 1, 1972, p. 14; and William C. Norby, "Fair Play in Earnings Forecasts," New York Times, Dec. 31, 1972, sec. 3, p. 12.

24. Cf. Tr. 152–153, 165. According to one of my favorite quotations from the late Justice Robert H. Jackson, "success depends on knowing what not to believe in

Moreover, with respect to figures relating to the company's affairs and ascertainable from the company's books, we find that plaintiff could and should and did rely on its own determinations rather than any representations by Rhoades.[25] Cline, a Rochez employee, was titular and also active head of the MS&R accounting department. (Tr. 1032, 1558, 1583–1584, 1591–1594). After the separation of accounting functions, checks were sent for signature to plaintiff, and had to be accompanied with supporting data regarding the company's bank account (Tr. 981–83; DX–76). There is no testimony that defendant siphoned off company income into other accounts or that the company's books were "doctored" in any way. Nothing except bad feelings and the distastefulness of contacts with Rhoades and employees loyal to him kept plaintiff from learning anything it wished to know about the affairs of MS&R.

Taking the view we do that defendant's nondisclosure prior to September 16, 1967, and nothing else done by defendant, constituted "fraud" in violation of Rule 10b–5, we are confronted with the problem of determining the measure of damages sustained by plaintiff.

At one extreme, defendant could contend that defendant's wrongful conduct was *functus officio*, and had fully spent its effects, when the Simmonds and Carus negotiations proved abortive; and that hence the damages were *nil*. On the other hand, plaintiff could contend that it is entitled to its equal moiety of the entire "take" or proceeds received by defendant in the Esterline deal. On principle we prefer plaintiff's position, for the reasons stated in Janigan v. Taylor, 344 F.2d 781, 786 (C.A.1, 1965). The court there said that where property is sold to the fraudulent party

future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.

It would not be fair or just, however, to extend this rule to its utmost limits. It must be applied with appropriate *temperamenta* (as the great jurist Grotius said of the strict rights of war.) [26]

Viewed realistically, much of the value for which Rhoades was paid by Esterline did not exist, and could not have existed, so long as Rochez remained half owner of MS&R. Much of this value was created by the enterprising labors of Rhoades, undeterred by the prudent diffidence of his associate Rochez. The importance of the aggressive management contributed by Rhoades is attested

accounting." F. P. C. v. Hope Natural Gas Co., 320 U.S. 591, 644, 64 S.Ct. 281, 307, 88 L.Ed. 333 (1944). Joseph Rochez is successful in business; his skeptical attitude towards figures furnished by Rhoades (and doubtless many other parties with whom he has had dealings during the course of his career) is probably a "substantial factor" if not the "proximate cause" of his success.

25. It is true that a situation resembling that in Janigan v. Taylor, 344 F.2d 781,

783 (C.A. 1, 1965), arose at a board meeting on July 7, 1967 when "Mr. Rochez pointed out that no projection of sales and cash flow had been made and he felt it should be done. Mr. Rhoades objected stating the latest projection that was made in December, 1966 remains unchanged and the forecast therein is correct as far as could be expected under present conditions." DX–97.

26. See Dumbauld, The Life and Legal Writings of Hugo Grotius (1969) 70.

to by the fact that Esterline as well as other potential purchasers of MS&R bargained for the continuance of Rhoades under the new ownership. (Tr. 564, 589). The Babcock & Wilcox contract, which Rhoades obtained and Rochez stoutly opposed at all times, turned out in fact to be the key, not to Pandora's box, but to much future business and profits for MS&R (Tr. 1338–1339).

The fact is that MS&R was in a situation where its value could be increased by an expansion of its business, upon an adequate financial basis. (Tr. 698). There was no chance for the creation of such a basis so long as the Rochez-Rhoades ownership continued. Rhoades was unable or unwilling to "ante up" his share of the needed capital, and Rochez rightly refused to bear the entire burden. Salvation lay in uniting the complete control of the company under good management in the hands of an adequately capitalized owner. As soon as such a buyer was found for 100 per cent of its stock, the value of MS&R stock increased *eo instanti* and *ipso facto*. When plaintiff sold its half, it was not worth much if anything more than what plaintiff received for it. It increased in value when the dissension between the joint owners and the chronic underfinancing terminated upon takeover by a new and strong owner. (Tr. 802).

So long as Rochez and Rhoades were equal owners, there was little hope of successful operation. They were in the position of the two men in the allegorical story of heaven and hell who found themselves confronting a delectable feast, but unable to bend their elbows so as to bring the food to their mouths. They turned their situation from a hellish to a heavenly one by cooperating and feeding each other. Rochez and Rhoades could not achieve this solution.

A destructive deadlock was destined to continue so long as the two half-owners continued to hold their stock.[27]

Hence it would be unjust to award Rochez the full value of the amount realized by Rhoades, to which Rhoades himself had partly contributed by his aggressive and enterprising management ability, and which was also partly due to the exit of Rochez and to the injection of a new and financially strong owner of undivided control.

The true measure of damages for the wrongful non-disclosure should be to place plaintiff in the same position it would have been in if Rhoades *had* made appropriate disclosure. What would Rochez have gotten for his stock if he had known before September 16, 1967, of the interest of Simmonds and Carus as potential purchasers?

■ We think that the value of the Simmonds offer should be the upper limit of plaintiff's damages. Rhoades contends that tax reasons led to the frustration of that deal, but the testimony of the Simmonds officials indicates that what really caused them to abandon the transaction was their unwillingness to assume any potential liability to plaintiff arising out of defendant's non-disclosure to the Rochez interests. We accept this evidence, and believe that if this hurdle had not existed, the able counsel involved in the matter would surely have been able to devise an acceptable solution to the tax problems involved. And of course there would have been no such hurdle if defendant had made the disclosure that the Simmonds transaction was pending. We believe that Rhoades would then have had the aid of Rochez as a suave and habile negotiator in helping to complete the Simmonds deal, and that it could have been successfully consummated.[28]

27. A classical case of the evils of equal ownership is the prolonged plight of Panagra Airlines. Pan American World Airways v. United States, 371 U.S. 296, 298, 327–328, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). The third director of MS&R, McClaran of PNB, was acutely conscious of the fatal effects of the dissension between Rhoades and Rochez. (Tr. 700).

28. Of course it is possible, as defendant contends, (Tr. 586–587), that plaintiff from a dog-in-the-manger antipathy to defendant would have rejected *ipso facto*

We are confronted with further uncertainties and confusion in attempting to determine the value of the Simmonds offer. Plaintiff's calculation is of course excessive, in attributing to the restricted stock offered by Simmonds the prevailing market value of unrestricted Simmonds stock. But the record contains little, if any, evidence of financial experts as to what the appropriate discount factor would be, in the instant situation, to allow for the disabilities inherent in stock subject to such restrictions.

The terms of the Simmonds offers are described in exhibits PX–12 through PX–24. According to PX–12, a letter from Simmonds to Rhoades dated September 29, 1967, the basic consideration was estimated at $2,850,000, based on 9.-2 times projected net earnings for the period October 1, 1966, to September 30, 1967, to be adjusted when audited figures were obtained. $650,000 was to be in convertible preferred stock with coupon equal to prevailing interest rates. The rest was to be common stock, with a bonus for performance the following year.

PX–15, dated November 17, 1967, raised the preferred to $750,000 and fixed the coupon at 6 per cent. PX–16, the auditor's report for year ended June 30, 1967, showed earnings of $269,343 (as contrasted with the $306,000 figure assumed in PX–12). PX–17, of December 19, 1967, approved by Rhoades, raised the common shares to 120,000 from the 110,000 of PX–15. The preferred was to be 20,000 shares valued at $55 per share.

PX–19A was a formal agreement prepared by defendant's tax counsel, Robert G. MacAlister, as a so-called "B" reorganization under 26 U.S.C. § 368(a)(1)(B). It provided for 7,000 shares of preferred with $5 par value, and an un-filled blank number of shares of common at $25 par value. Recitals showed 2,604,084 outstanding shares of Simmonds common stock. Another recital provided that the stock delivered was to be unrestricted and fully listed on the American Stock Exchange. However, later provisions in Section 8 of the draft agreement contemplated registration of only 35,000 shares within 120 days. For other sales registration would be effected after a period of one year. Section 6.4 required an investment letter from Rhoades and the affixing of a restrictive legend to the certificates.

PX–19B (prepared by Simmonds counsel as a "C" reorganization, Tr. 1474–1475) contemplates acquisition of MS&R assets by a new subsidiary of Simmonds in exchange for 120,000 shares of Simmonds common stock with par value of 25 cents a share, and 20,000 shares of preferred with par value of $5 a share. Restrictive provisions are the same as in PX–19A.

PX–20, the auditor's report for six months ending December 31, 1967, shows earnings of $435,376, including retained earnings, the actual net operating income being $166,033. The net income shown in PX–16 was $188,896.

Little light is to be found regarding the valuation of restricted stock, although the technique of disposal of such stock has been discussed.[29] Obviously a number of factors require consideration. These would include the length of the period of restriction, the amount of new and old stock, the customary volume of transactions, the frequency and amplitude of anticipated fluctuations in the market, and the underlying trend based upon intrinsic factors. In a conglomerate acquisition which might temporarily enhance the buyer's stock, a subsequent fall might be anticipated after the pro-

---

any deal originated by Rhoades. But we believe that self-interest would have prevailed over sentiment and that Rochez would have contributed to consummation of a deal with Simmonds.

29. Robert S. Green, "Selling Restricted Securities under Rule 144—A Practical Guide", 18 The Practical Lawyer 13 (May, 1972); "Resale of Restricted Securities under SEC Rule 144", 81 Yale L.J. 1574 (July, 1972).

moters had unloaded some of their preexisting stock without the depressing effect of sales of the newly-issued stock. The effect of the restriction might well be considered a substantial factor calling for considerable discount in determining the value of restricted stock.

In a sense, the very fact that issuers impose a restriction on transferability is an indication of their recognition of the speculative and unstable quality of the stock. Restraints on alienation have long been viewed with disfavor.[30] That Simmonds stock was subject to fluctuation is shown by the fact, of which we may take judicial notice, that its range in 1972 was between 4½ and 7⅞,[31] whereas during the last quarter of 1967 it sold between 37 and 25 (PX–34 and 35).

In view of the foregoing considerations, and recognizing that our conclusion is arbitrary in the statistical (rather than the constitutional) sense,[32] we find that with plaintiff's cooperation under proper disclosure by defendant, the sum of $2,000,000 could have been obtained for the MS&R stock. Having sold for $598,000 rather than $1,000,000, plaintiff's damages therefore amount to $402,000.

In conclusion, a word should be said regarding the sufficiency of the proof regarding the quasi-jurisdictional matter of use of interstate instrumentalities.

■ Although from a substantive standpoint this seems a triviality, yet as the statute and Rule 10b–5 are worded,[33] the use of interstate instrumentalities is an indispensable factor in establishing a wrongful nondisclosure or other violation of the Rule.

■ Such use of interstate instrumentalities has been adequately established, in our judgment, even assuming that the use of such instrumentalities must be as a means of effectuating or directly connected with the substantively wrongful act (*animo rem sibi habendi*, so to speak) and not as an isolated incident; and confining such use to the period prior to September 16, 1967. Defendant's own testimony established interstate telephone calls and air travel. (Tr. 862–864, 1672–1673, 1686–1688, 1717, 1719, 1722–1726). The mere fact that the owners of the stock lived in the Pittsburgh area and that perhaps the most crucial negotiations for the sale from plaintiff to defendant took place in

---

**30.** See the classical treatise of John Chipman Gray, Restraints on Alienation (2nd ed. 1895), as well as recent antitrust cases such as White Motor Co. v. United States, 372 U.S. 253, 256, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); United States v. Arnold, Schwinn & Co., 388 U.S. 365, 378, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

**31.** New York Times, Jan. 7, 1973.

**32.** By "arbitrary" we mean a rough rule of thumb representing an approximation approaching an actual but uncertain amount, such as the "arbitraries" added in computing freight rates for ferriage, wharfage, and other accessory services; or the "standard deduction" or sales tax tables used in income tax computations, or the deductions for entertainment formerly allowed under the "Cohan rule." See Rabkin & Johnson, Federal Income, Gift and Estate Taxation, vol. I, § 3.01 p. 303; Cohan v. Commr. of Int. Revenue, 39 F.2d 540, 543–544 (C.C.A. 2, 1930). In the words of the inimitable Learned Hand

"It is not fatal that the result will inevitably be speculative; many important decisions must be such." 39 F.2d at 544. See also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 378–379, 47 S.Ct. 400, 71 L.Ed. 684 (1927). In the constitutional sense, of course, "arbitrary" means tyrannical, oppressive, and violative of due process.

**33.** See Bromberg, II, sec. 11.2, pp. 245–246 [1968]. This wording was doubtless adopted in order to satisfy the strict standards then applicable to the definition of interstate. commerce and the extent of federal power with respect thereto under decisions of the Supreme Court under the "Nine Old Men." See Dumbauld, The Bill of Rights and What It Means Today (1957) 65–66. Such scruples would be superfluous since United States v. Darby, 312 U.S. 100, 113–115, 61 S.Ct. 451, 85 L.Ed. 609 (1941), and Wickard v. Filburn, 317 U.S. 111, 121, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

that city [34] does not detract from the sufficiency of the clear showing of use of interstate facilities as a means of wrongfully violating the requirements of Rule 10b–5.

Accordingly, we enter judgment for plaintiff and against defendant in the amount of $402,000 with interest from September 16, 1967. This opinion shall be deemed to constitute the Court's findings of fact and conclusions of law. Because of the thoroughness and excellence of the proposed findings and conclusions submitted by counsel for both parties, we have ordered them to be filed as part of the record, for the convenience of reviewing courts in the event that the reasoning of this Court is found to be a deficient appraisal of the realities captured in the record.[35]

---

34. Use of the mails was undoubtedly involved even in these negotiations themselves. Tr. 87.

35. A former law clerk of Justice Brandeis states that the Justice always wrote himself the statement of facts in an opinion.

"This was his assurance that he would not be seduced by the fascination of legal analysis until he had grounded himself in the realities of the case as they were captured in the record." Paul A. Freund, On Understanding the Supreme Court (1949) 50.