**Norman B. GOODMAN et al.,
Plaintiffs,**

**Mildred N. Ostrow et al., Intervening
Plaintiffs,**

v.

**Sidney POLAND et al., Defendants.**

**Milton B. EDELSON and N. Edward
Nachlas, Plaintiffs,**

v.

**Sidney POLAND, et al.,
Defendants.**

**Civ. A. Nos. 21158-N, 21550-N.**

United States District Court,
D. Maryland.
May 28, 1975.

---

5. This hearing was before the Circuit Court without a jury as provided by law.

Herbert M. Brune and Harrison M. Robertson, Jr., Baltimore, Md., for plaintiffs in Civ.A. No. 21158.

Leroy W. Preston, John Wheeler Glenn, and O'Connor & Preston, Baltimore, Md., for plaintiffs in Civ.A. No. 21550.

H. Vernon Eney, Robert R. Bair and Venable, Baetjer & Howard, Baltimore, Md., for defendants in both cases.

NORTHROP, Chief Judge.

These consolidated actions under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, arise out of the purchase in March and April, 1968, by defendants of certain securities owned by plaintiffs. The original complaint in Civil No. 21158 was filed in this Court on August 27, 1969, while the complaint in Civil No. 21550 was filed on December 19, 1969. Pursuant to a motion by defendants, this Court on February 26, 1970, issued an Order consolidating the two cases for all purposes.

On June 13, 1974, after almost five years of discovery and other proceedings in this Court, plaintiffs moved for leave of Court to file a 101-page amended complaint. After a hearing, and over defendants' opposition, this Court on July 25, 1974, issued an Order granting plaintiffs' Motion. Defendants subsequently filed a Motion to Dismiss and for Summary Judgment. Both sides also moved for a partial summary judgment and preliminary determination by this Court as to the date on which the defendants' duty to disclose any material information under Rule 10b–5 terminated. A hearing was held on those motions and the issues raised therein are now before this Court for its decision.

## BACKGROUND

In order to place the ensuing discussion of the various legal questions raised by the parties in some kind of perspective, a brief discussion of the allegations of the complaints in these cases is appropriate and necessary. The following discussion is provided as background only, however, and a more specific discussion of the relevant facts will be set forth in connection with the various issues raised. On a motion to dismiss, the well-pleaded material allegations of the complaint are taken as being admitted. 2A J. Moore, Federal Practice ¶ 12.08, at 2265–69 (2d ed. 1974). Therefore, the following summary is drawn primarily from the allegations of the amended complaint.

In 1962, defendants Sidney Poland and Morton Poland were the sole stockholders, principal executive officers and directors of Poland Brothers, Inc., a Maryland corporation engaged in business as a distributor of packaging products. In that year they approached a number of their personal and professional friends, including a number of the plaintiffs herein, with respect to raising capital for the promotion of two newly incorporated Maryland corporations, Imperial Packaging Corporation (hereinafter "Imperial") and Imperial Properties Corporation (hereinafter "Properties"). Imperial was being formed to manufacture under license from the patent holder a completely new type of paper box, chiefly for items of apparel, known as the "Carrier Box." Properties was being formed to hold title to the manufacturing plant of Imperial in Baltimore County, and to lease the same to Imperial. Poland Brothers, Inc., was to be the sole distributor of Imperial's products, for which service it was to receive reimbursement for its actual overhead expenses incurred in distributing such products.

An agreement was subsequently reached whereby the Polands' friends invested $260,000, for which they received

debentures, preferred stock and 48 percent of the common stock of each company, while the two Polands invested $32,496, for which they received 52 percent of the common stock of each company. At the organizational meeting of Imperial's prospective investors in May, 1962, it was promised that, in addition to the two Polands, the Board of Directors would include a fair representation of the other stockholders, and the names of five minority stockholders were nominated for membership on the original Board. Two additional stockholders were added to the Board of Directors at its meeting on August 29, 1963.

Thereafter the composition of the Board remained substantially unchanged until the annual stockholders' meeting on August 4, 1966, at which the Polands caused the number of directors comprising the Board to be reduced to five. Only four directors were elected at that meeting, however, including the two Polands, Walter Gettinger (a close personal friend of the Polands and a member of the "friendly" minority), and Herbert Garten (a member of the "dissident" minority). Gettinger subsequently resigned from the Board in protest of certain action proposed to be taken by the Polands at the Board meeting on April 10, 1967.

At the next annual meeting of stockholders, which was held on June 14, 1967, the Polands caused five persons to be elected to the Board, including themselves and three employees of their wholly-owned company, Poland Brothers, Inc. Thereafter the Poland brothers, in addition to being the majority and controlling stockholders in Imperial, were also in full control of its Board of Directors. The plaintiffs herein were, in 1968, the holders of 14 units of subordinated debentures and preferred and common stock of Imperial and Properties.[1]

According to plaintiffs, defendants Sidney and Morton Poland used their control over Imperial during the period from 1962 to 1968 to cause it to enter into various unfair and oppressive contractual arrangements by which its income and assets were diverted to their wholly-owned company, Poland Brothers, Inc. These arrangements allegedly included 1) the exaction of an excessive commission arrangement in violation of the original investment agreement of the parties, 2) the charging of an unauthorized and excessive "management fee" for services rendered to Imperial by Morton Poland, and 3) the wrongful appropriation of a corporate opportunity to manufacture certain notion and millinery bags previously purchased by Poland Brothers, Inc. from other manufacturers. The first and third of those claims along with another claim not discussed in the instant complaint were the subject of a stockholders' derivative action, *Norman B. Goodman, et al. vs. Imperial Packaging Corporation, et al.*, No. A–49603, filed in the Circuit Court of Baltimore City on March 1, 1968, by certain of the plaintiffs herein as stockholders of Imperial.

Certain of the plaintiffs herein had also previously initiated another suit in the Circuit Court of Baltimore City, *Gilbert S. Levine, et al. v. Imperial Packaging Corp., et al.*, No. A–49041, seeking to enjoin a proposed offering of additional shares of Imperial as being in violation of their pre-emptive rights. That action resulted in a decision and decree entered February 12, 1968, enjoining the proposed offering, which decree was still in full force and effect on April 15, 1968, although a timely appeal therefrom had

---

1. Each "unit" of Imperial securities, in 1968, consisted of the following:

Imperial Packaging Corporation:

1,346 shares of Common Stock
6,844 shares of Preferred Stock (par value $1.00)

$2,808 principal value of 8% Debentures

Imperial Properties Corporation:

150 shares of Common Stock
760 shares of Preferred Stock (par value $1.00)
$312 principal value of 8% Debentures

been taken by the defendants in that action.

On February 13, 1968, immediately after the entry of the above decree, the Polands caused Imperial to offer 42,125 additional shares of common stock proportionately to all of its stockholders at $7.00 per share. In connection with that offering they represented that Imperial was in critical condition because of a lack of cash and that such an offering constituted the only feasible means of financing the company's continuing operations. The plaintiffs herein, however, decided not to purchase such shares, even though such failure would lead to a diminution of their proportionate ownership in the company. Unbeknownst to plaintiffs, such additional shares were never in fact subsequently issued.

In late February, 1968, preliminary negotiations for a settlement of all the pending litigation involving Imperial were entered into. In connection therewith, plaintiffs requested that they be furnished with up-to-date financial statements as to both Imperial and Poland Brothers, Inc. No such statements were released for the latter corporation, however, while the latest statement for Imperial which was made available was an unaudited interim six-month statement as of October 31, 1967.

On February 28, 1968, Dr. N. Edward Nachlas, who together with Milton B. Edelson owned one unit of Imperial Packaging and Imperial Properties securities,[2] telephoned Sidney Poland to inquire as to the possibility of arbitrating the differences with the dissident stockholders. Mr. Poland allegedly responded that there was no chance of anything being worked out. However, he suggested that he might be able to get some money from a source in New York to buy out the various minority interests. The Polands met with Dr. Nachlas and Mr. Edelson at the latter's apartment that evening to further discuss the matter.

At that meeting the Polands allegedly told Dr. Nachlas and Mr. Edelson that Imperial was in a very bad position financially, and was unable to meet its current bills, including a note for $93,600 which was due at the bank. They further allegedly stated that competition for the Carrier Box was getting increasingly intense and that the patent for it was questionable, so that prices, and consequently profits, could be expected to drop even further. Finally, the Polands reportedly stated that there was no possibility of a merger or of a public offering for Imperial stock in light of the company's poor financial condition, and that the best thing which Dr. Nachlas and Mr. Edelson could do was to sell out inasmuch as they were otherwise locked-in with their investment.

The Polands concluded by offering to purchase their unit of Imperial Packaging and Imperial Properties securities for $27,500, on the express condition that the Polands could acquire five additional units, and on the further condition that if they bought the other units at a higher price, they would pay Dr. Nachlas and Mr. Edelson an equal amount. Dr. Nachlas and Mr. Edelson agreed to the terms offered, and arrangements were made for them to go to the offices of Weinberg & Green, counsel for Imperial and Poland Brothers, Inc., to sign a letter covering the oral agreement.

On March 3 and 4, 1968, the Polands entered into similar negotiations and agreements with plaintiffs Dr. Leonard Lister and Mr. Samuel Levinson, respectively. On March 5, 1968, Sidney Poland called Mr. Norman Goodman and asked him to convene a meeting of the remaining minority shareholders then in litigation with the Polands to discuss the possibility of the Polands buying them out. He specifically requested that such meeting be held without the presence of legal counsel. The requested meeting was held that same evening at

---

2. Dr. Nachlas and Mr. Edelson are the sole plaintiffs in Civil No. 21550.

Mr. Goodman's home in Baltimore County. At that meeting the Polands reiterated many of the statements previously made to Dr. Nachlas and Mr. Edelson. They further pointed out that the common stock of Imperial had been diluted by the subscription to the offering made the previous month, and they indicated that there would be another such offering in the near future. During the course of the meeting Mr. Goodman and several of the other plaintiffs herein asked the Polands "whether there was anything in the wind." The Polands repeatedly replied that there was nothing pending, and Sidney Poland indicated that his wife's health and the adverse effect of the pending litigation on his standing in the Jewish community were the moving factors behind his wanting to buy out the dissident stockholders.

By the conclusion of that meeting a general verbal agreement had been reached whereby the Polands agreed to buy out all of the minority interests at a price of $29,000 per unit plus $30,000 in legal fees for plaintiffs' counsel. That agreement, however, was expressly conditioned upon all of the dissident minority shareholders agreeing to sell their shares. Moreover, the specific terms of the agreement were to be ironed out between counsel for the two sides.

As a result of subsequent discussions between counsel, the actual purchase price was reduced to $28,650 per unit in order to split the difference of $700 in principal amount which had been paid out previously to each of the plaintiffs in reduction of the principal amount of certain debentures held by them. In addition, the sum for plaintiffs' legal expenses was increased to $32,400. Thus, the total price for the 14 units required to be included in the sale was $433,500. These terms were agreed to by counsel by March 12, 1968, and were incorporated into a final written agreement which was signed by the Poland brothers on or before March 15, 1968, and by all of the plaintiffs herein by March 25, 1968. As a part of said agreement, plaintiffs were to arrange for the dismissal of the various litigation previously referred to which was still pending in the state courts. Closing was scheduled for April 15, 1968. On that date the signed Agreements were exchanged and the securities delivered against payment.

Unbeknownst to plaintiffs, and contrary to the Polands' express representations to them, it is alleged that Sidney and Morton Poland had entered into negotiations with the New York investment firm of Donaldson, Lufkin & Jenrette, Inc., in February and March, 1968, concerning a possible purchase by the latter of a 25 percent interest in a merged Imperial-Poland Brothers, Inc., for the sum of $1,500,000. Furthermore, on March 20, 1968, Morton Poland initiated discussions with the Union Trust Company of Baltimore, Maryland, concerning the possibility of arranging alternative financing for the combined companies in the form of a $1,000,000 term loan and a $500,000/$600,000 line of credit. In connection therewith, Morton Poland informed the bank of the ongoing negotiations with Donaldson, Lufkin & Jenrette and painted a considerably different, and far more promising, picture of the current status and future prospects of Imperial than had previously been conveyed to plaintiffs.

Finally, during March, 1968, the Polands apparently also entered into merger negotiations, through the intermediary services of Coenen & Company, a New York firm specializing in arranging corporate acquisitions and mergers, with Cole National Corporation of Cleveland, Ohio.

After considerable discussion, the latter negotiations culminated in a tentative agreement on April 19, 1968, whereby Cole National was to acquire the combined assets of Imperial and the various Poland companies for a basic price of $7,000,000, with an additional payment to be based on average net earnings after taxes in excess of $600,000 per annum for the fiscal years ending April 30, 1969, and April 30, 1970.

During the ensuing months, and while the details of the proposed merger with Cole National were being refined, the Polands continued to seek out other merger or sale possibilities. As a result of such efforts, they ultimately were directed to APL Corporation, a New York-based firm whose stock was then listed on the American Stock Exchange.[3] Negotiations with Mr. Harold Schwartz, the Chairman of the Board of APL, during the last week in August and the first week in September, 1968, resulted in an agreement on September 5, 1968, whereby APL agreed to sign a contract for the acquisition of the combined imperial-Poland companies prior to the September 13, 1968 date set for completion of the agreement with Cole National. On September 11, 1968, formal agreements were exchanged whereby APL was to acquire the combined Imperial-Poland companies, subject to certain favorable tax rulings from the Internal Revenue Service, for a total estimated consideration in excess of $10,000,000. Sidney Poland subsequently telephoned Cole National advising it that the Polands had sold out to APL.

News of the acquisition by APL was made public the next day, September 12, 1968, when it was carried on the ticker tape. The following day it was reported in both the Wall Street Journal and the Baltimore Sun. The acquisition, in its original form, was approved by the stockholders of APL at their annual meeting on January 6, 1969. However, in April, 1969, the Internal Revenue Service indicated that several requested rulings as to the taxability of the transaction would not be issued without certain changes in the form of the transaction. Therefore, the APL transaction was renegotiated so as to take the form of two separate transactions, one involving the sale of Imperial Packaging in a taxable transaction and the other involving the sale of the remaining Poland companies in a tax-free reorganization. The renegotiated transaction was ap-

proved by the APL stockholders at a special meeting on June 17, 1969, and was closed on June 19, 1969. The instant actions were commenced only a little over two months later with the filing of the original complaint in Civil No. 21158 on August 27, 1969.

## POSTURE OF THE CASE

A. *The Original Complaint:* In their original complaints plaintiffs essentially sought a rescission of the sale and settlement agreement of April 15, 1968, on the grounds that the sale of their securities, and the simultaneous release of the pending state court litigation, had been procured in violation of both the federal and Maryland securities laws. Thus, the first count alleged that the defendants had violated section 10(b) of the Securities Exchange Act and Rule 10b–5 thereunder in that they had made certain false representations as to the current condition of Imperial and had failed to disclose the existence of negotiations with third parties concerning the sale of the assets or stock of Imperial. The second count alleged that the same actions and omissions also constituted a violation of section 13 of the Maryland Securities Act, Md.Ann.Code art. 32A, § 13.

The second count also contained two paragraphs alleging additional violations of Maryland common law, although apparently not raising such violations as independent claims. Thus, paragraph 41 alleged that the actions of the Polands, in failing to disclose all the facts having a bearing on the purchase of plaintiffs' securities, constituted a breach of an alleged fiduciary duty which they, as controlling stockholders, controlling directors and chief executive officers of both Imperial Packaging and Imperial Properties, owed under Maryland common law to each of the plaintiffs as minority stockholders. Paragraph 42 in essence raised a claim of common law fraud, alleging that "the representations including the significant omissions therefrom . . . were false and fraudulent

---

3. In 1970 the stock of APL Corporation was listed on the New York Stock Exchange.

in law and were made . . . either with knowledge of their falsity or in reckless disregard of their truth or falsity, and with knowledge and intent that Complainants should and would rely on such misrepresentations."

As relief under the original complaint, plaintiffs sought a decree that the sale and settlement agreement of April 15, 1968, including the releases executed as a part thereof, was null and void pursuant to section 29 of the Securities Exchange Act, 15 U.S.C. § 78cc. They further requested a decree that they were entitled to rescind said sale, and settlement, and they requested that specific restitution be decreed as to the securities of Imperial Properties, which was still owned by the Polands. However, in recognition of the fact that specific restitution was no longer practical with respect to their securities in Imperial Packaging, plaintiffs instead requested a judgment for money damages sufficient to place them in the same position which they would have occupied upon a specific restitution.

In determining the amount of such monetary damages, plaintiffs alleged that the 78 percent-22 percent allocation of the APL consideration between the Poland companies and Imperial, which had been unilaterally designated by the Polands, was manifestly unfair. Thus, in determining the fair value of their holdings in Imperial, they contended that this Court should reapportion the APL consideration between the various companies either on a basis of their respective earnings or their respective book values. Using the first of these measures, and considering the average

earnings of Imperial and of the Poland companies for the three fiscal years ending April 30, 1965, 1966 and 1967, plaintiffs contended that the allocation should be reversed in Imperial's favor by an at least 56.68 percent to 43.32 percent margin. The second measure provided a result even more favorable to Imperial. Although plaintiffs further alleged that any reapportionment should probably be weighted even more heavily in Imperial's favor in order to give effect to the alleged wrongfully appropriated earnings and corporate opportunities of Imperial, they expressly disavowed any desire to have this Court attempt to estimate the amount or value of such wrongful appropriations.[4]

B. *The Amended Complaint*: In contrast to the rescissory relief sought in the original complaint, the amended complaint, which is framed in four separate counts, essentially states an action for monetary damages at law. Thus, although plaintiffs still seek a declaration that the Agreement of Sale and Settlement of April 15, 1968, including the releases executed as part thereof, is void under section 29 of the Securities Exchange Act, they no longer seek a decree that they are entitled to rescission. Instead, the amended complaint sets forth a claim for monetary damages under each of the separate counts.[5]

As in the first count of the original complaint, the first count of the amended complaint alleges that the various misrepresentations and omissions by the defendants in connection with their purchase of plaintiffs' securities constituted a violation of section 10(b) of the Securities Exchange Act and Rule 10b–5

4. *See* Complaint in Civil No. 21158, ¶ 33, at 24, and ¶ 34, at 26.

5. As originally drawn, the amended complaint also contained a prayer that defendants be required to account for the profits realized by them as a result of their alleged wrongful diversion of profits and earnings from Imperial to Poland Brothers as well as for the plaintiffs' share of the profits realized from the acquisition and resale of plaintiffs' securities. In response to defendants' objections, however, plaintiffs subsequently expressed their willingness to drop their prayer for an accounting by deleting paragraph (d) of the general prayers and by deleting paragraph 183 of the second count. This Court will accept the proffered amendments, and in its discussion herein it will treat the amended complaint as if it had already been so further amended.

thereunder. The second count, apparently picking up on paragraph 41 of the original complaint, alleges that the Polands violated their Maryland common law duty as controlling stockholders, controlling directors and chief executive officers of Imperial Packaging and Imperial Properties to plaintiffs, as minority stockholders therein, by failing to disclose all the material facts known to them in connection with the purchase of plaintiffs' securities.[6]

The third count of the amended complaint is essentially parallel to the second count of the original complaint and it alleges that the various misrepresentations and omissions by the defendants in connection with the purchase of plaintiffs' securities constituted a violation of Md.Ann.Code art. 32A, § 13. Finally, the fourth count alleges that the actions of the defendants in connection with the purchase of plaintiffs' securities were conceived and carried out with the deliberate intent to defraud and deceive, amounting under the circumstances to common law fraud, entitling plaintiffs to recover not only compensatory damages but also punitive damages.

Pursuant to section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, this Court has exclusive jurisdiction over the claim set forth in the first count. However, inasmuch as the second, third and fourth counts all allege claims arising under Maryland statutory and common law, this Court's jurisdiction over them is premised solely on the doctrine of pendent jurisdiction. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

C. *Defendants' Motion to Dismiss and for Summary Judgment*: In their Motion to Dismiss and for Summary Judgment, defendants have raised a number of challenges to each of the various counts of the amended complaint. While the arguments in support thereof will be considered in greater detail *infra*, defendants' contentions may be summarized as follows:

1) As to the first count, defendants contend that there is no genuine issue as to any material fact with respect to the issues of unreasonable delay and laches, and that they are entitled to a partial summary judgment holding that plaintiffs, by reason of their unreasonable delay in asserting a claim for rescission, have lost any right to rescission or rescissional damages to which they might otherwise have been entitled. Defendants further contend that plaintiffs should be barred from any recovery whatsoever by reason of laches. Defendants finally contend that if summary judgment is granted for them as to the entire first count on the basis of laches, the remaining pendent state law

---

6. As drawn, the second count of the amended complaint appeared to allege a further claim under Maryland common law based on the defendants' alleged wrongful diversion of the profits and earnings of Imperial to Poland Brothers. *See* Amended Complaint ¶ 179. However, in response to defendants' objections concerning the inclusion of such a separate claim, plaintiffs have explained that the discussion of the derivative suit claims in the second count related only to the issue of damages under that count and not to any independent liability being asserted therein. *See* Memorandum of Plaintiffs in Support of their Answer to Motion to Dismiss and for Summary Judgment at 18. Thus, plaintiffs submit that the second count of the amended complaint should only be construed as setting forth a claim for breach of the duty of a controlling stockholder-director to disclose facts known to him when he purchases stock of the corporation from a minority stockholder, and not as setting forth any claim in the nature of a derivative suit. *Id.,* at 14–15.

Inasmuch as plaintiff's requested construction is consistent with their amended prayer for damages under the second count, *see* note 5 *supra,* and furthermore, inasmuch as it reduces the burdens on defendants, this Court will construe the second count as being so limited. In this connection, however, the Court further wishes to point out that any claim in the nature of a derivative action would be barred in this suit under the principles enunciated in Armstrong v. Frostie Co., 453 F.2d 914, 916–17 (4th Cir. 1971), and Waller v. Waller, 187 Md. 185, 189–94, 49 A.2d 449 (1946).

claims should be dismissed without further proceedings in this Court.

2) Defendants contend that the second count should be dismissed for failure to state a claim upon which relief can be granted inasmuch as there is no fiduciary duty owed in Maryland by a controlling stockholder or director to a minority stockholder with respect to his stock.[7]

3) Defendants assert that the third count should also be dismissed for failure to state a claim upon which relief can be granted on the ground that there is no private right of action in a seller of stock under Md.Ann.Code art. 32A, § 13.

4) Finally, defendants contend that the fourth count should be dismissed on the ground that it raises a new claim which is barred by the applicable Maryland statute of limitations since under Maryland law it would not be deemed to relate back to the original complaint. Defendants also contend that the fourth count is barred under Maryland's doctrine of election of remedies and by reason of waiver and estoppel.

In addition to the above, defendants have also raised a number of arguments concerning plaintiffs' theory of damages and particularly concerning the role to be played therein by the so-called derivative suit claims.[8] While this Court would not normally entertain arguments relating to the scope of damages at this stage of the proceedings, it will do so in the instant case because of the important consequences which a resolution thereof will have on the scope of the trial eventually to be held on the merits of plaintiffs' claims.

For the reasons to be set forth below, this Court finds that defendants' arguments as to the first and fourth counts are without merit. However, it finds itself basically in agreement with their arguments as to the second and third counts. Moreover, the Court notes that the allegations contained in those two counts, as well as the relief sought thereunder, are basically the same as those contained in the first count. Those counts, therefore, will be dismissed. With respect to the issue of damages, and assuming that plaintiffs can establish entitlement thereto, this Court feels that plaintiffs might be able to recover something for the value of their surrender of their right to prosecute the state court derivative suit claims if they can establish that such had any value in excess of what was included in the settlement of April 15, 1968. However, it does not believe that plaintiffs should be allowed to litigate those claims, which were previously dismissed with prejudice in the state courts, in this Court under the guise of damages.

D. *Cross-Motions for Partial Summary Judgment*: Finally, both sides have requested this Court to issue a partial summary judgment determining the date on which the defendants' duty to disclose any material facts in connection with their purchase of plaintiffs' securities terminated. For the reasons set forth below, this Court agrees with the parties that such issue is ripe for summary judgment and it holds that the defendants' duty to disclose terminated on March 25, 1968, the date by which all of the plaintiffs had signed the formal agreement of sale and settlement.

---

7. In their instant motion defendants raised a number of additional contentions pertaining to plaintiffs' apparent inclusion in the second count of a claim for breach of fiduciary duty in connection with the so-called derivative suit claims. Inasmuch as this Court, in accordance with plaintiffs' request, is construing the second count of the amended complaint as raising only a single claim relating to an alleged breach of the fiduciary duty of a controlling stockholder-director to disclose facts known to him when he purchases stock from a minority stockholder, *see* note 6 *supra*, those contentions will not be considered herein except insofar as they pertain to consideration of the derivative suit claims as an element of damages. *See* part V *infra*, 687–689.

8. *See* discussion *supra* at 666.

## DISCUSSION

### I. The First Count

As has been previously noted, the first count of the amended complaint alleges that the various representations and omissions made by the defendants in connection with their purchase of plaintiffs' securities constituted a violation of section 10 of the Securities Exchange Act and of Rule 10b–5 thereunder. Plaintiffs, therefore, seek as monetary damages the difference between the fair value of all that they received under the settlement of April 15, 1968, and the fair value of what they would have received had there been no fraudulent conduct on the part of the defendants.

While not challenging the substance or sufficiency of the allegations contained in that count, defendants have challenged the propriety of granting plaintiffs relief thereunder. Thus, they contend that plaintiffs are chargeable with unreasonable delay in asserting their claims, and that under the doctrine of *Baumel v. Rosen,* 412 F.2d 571, 574–75 (4th Cir. 1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 688, 24 L.Ed.2d 681 (1970), they should therefore be barred from seeking either rescission or rescissional damages. Moreover, defendants contend that inasmuch as such delay worked to their detriment by depriving them of certain options which might otherwise have been available, plaintiffs should be barred from seeking any relief whatsoever by application of the doctrine of laches. On the ground that there is no genuine issue as to any material fact with respect to either the issue of unreasonable delay or that of laches, defendants therefore request this Court to enter either a partial or total summary judgment in their favor as to the first count of the amended complaint.[9]

9. As noted previously, defendants have further moved that the remaining pendent state law claims be dismissed if they are granted summary judgment as to the first count on the issue of laches. *See* United Mine Workers of America v. Gibbs, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218

In *Molinaro v. Watkins-Johnson CEI Division,* 359 F.Supp. 467, 469 (D.Md.1973), this Court recently had occasion to review the decisions of the Fourth Circuit concerning the granting or denial of summary judgment under Fed.R.Civ.P. 56, and it noted the "very strict standard" which must be met before summary judgment can be granted in this Circuit. *Cf. Clarke v. Montgomery Ward & Co.,* 298 F.2d 346, 348 (4th Cir. 1962). Thus, in this Circuit not only can there be no dispute as to the evidentiary facts, but there cannot even be any disagreement as to the inferences or conclusions which might be drawn therefrom. *Johns Hopkins University v. Hutton,* 488 F.2d 912, 918 (4th Cir. 1973), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 1623, 40 L.Ed.2d 118 (1974); *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 381 F.2d 245, 249 (4th Cir. 1967); *American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co.,* 354 F.2d 214, 216 (4th Cir. 1965); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir. 1950); *Macy v. Trans World Airlines, Inc.,* 381 F.Supp. 142, 145 (D.Md.1974). Moreover, the party moving for summary judgment has the burden of clearly demonstrating that there is no genuine issue of fact, and any doubt as to the existence of such an issue will be resolved against him. *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co., supra,* 381 F.2d at 249; *Molinaro v. Watkins-Johnson CEI Division, supra,* 359 F.Supp. at 469; 6 J. Moore, *supra,* ¶ 56.15[3], at 2335. Finally, the party opposing the motion is entitled to all of the favorable inferences to be drawn from the evidence. *Cram v. Sun Ins. Office, Ltd.,* 375 F.2d 670, 674 (4th Cir. 1967); *Macy v. Trans World Airlines, Inc., supra,* 381 F.Supp. at 145; *Walpert*

(1966); *cf.* Carliner v. Fair Lanes, Inc., 244 F.Supp. 25, 30–31 (D.Md.1965). However, inasmuch as this Court finds that defendants' claim for summary judgment is without merit, that contention will not be further considered herein.

*v. Bart,* 280 F.Supp. 1006, 1011 (D.Md. 1967), *aff'd,* 390 F.2d 877 (4th Cir. 1968) *(per curiam).*

In the instant case, notwithstanding plaintiffs' assertions to the contrary, a review of the materials submitted in support of, and in opposition to, the defendants' motion reveals that there is no genuine issue as to any of the material historical facts relating to either the issue of unreasonable delay or that of laches. However, the same certainly cannot be said with respect to all the inferences which might reasonably be drawn therefrom, as is well evidenced by the diametrically opposed arguments of counsel, both in their various memoranda and in oral argument. Therefore, were this Court otherwise in doubt as to the propriety of denying defendants' instant motions for summary judgment, it would deny them at this time on that basis alone. *See American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co., supra,* 354 F.2d at 216. However, this Court feels that on the basis of the record as it presently exists, there is no basis for a finding of unreasonable delay on plaintiffs' part.

■ Of course, as defendants correctly point out, it is now well settled that rescission is a radical remedy which must be promptly asserted once a party is put on sufficient notice of the grounds therefor. *Baumel v. Rosen, supra,* 412 F.2d at 574; *Myzel v. Fields,* 386 F.2d 718, 740–41 n. 15 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S. Ct. 1043, 19 L.Ed.2d 1143 (1968); *Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 303 F.2d 527, 532 (10th Cir. 1962); *Chelsea Associates v. Rapanos,* 376 F. Supp. 929, 943 (E.D.Mich.1974). Thus, in *Baumel v. Rosen, supra,* 412 F.2d at

574, the Fourth Circuit stated as follows:

> Rescission is a radical move, and the law exacts the election of that course to be asserted without wait. The demand is that advice of the determination be given within a reasonable time after discovery of the ground for rescission.

> This principle is stringently administered. Reasonable time is inceptive from the receipt by the rescinder of word putting him on notice. It is then incumbent upon him to pick up the scent and nose to the source. See Friedman, Delay As a Bar to Rescission, 26 Cornell Law Quarterly 426, 432, text at footnote 31 and authorities cited therein (April 1941). If the quest confirms the suspicion, then he must make decision with reasonable dispatch. Failing this, entitlement to rescission disappears.

That principle was recently reaffirmed in *Johns Hopkins University v. Hutton, supra,* 488 F.2d at 917, in which the Fourth Circuit further stated that the party seeking rescission "was required to act with reasonable dispatch after it had either actual knowledge of the fraud or notice of facts which, in the exercise of due diligence, would have led to knowledge thereof." *See also Occidental Life Ins. Co. of North Carolina v. Pat Ryan & Associates, Inc.,* 496 F.2d 1255, 1268 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974).

In the instant case, the undisputed facts reveal that once plaintiffs received information putting them on notice that they might have been defrauded, they acted promptly and with reasonable diligence [10] "to pick up the scent and

---

10. In Johns Hopkins University v. Hutton, 488 F.2d 912, 918 (4th Cir. 1973), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 1623, 40 L.Ed.2d 118 (1974), the Fourth Circuit held that in a jury case the issue of reasonable diligence should be submitted to the jury and was not appropriate for summary judgment. That decision is not controlling in the instant case, however, inasmuch as this action is to be tried directly to the Court and not to a jury. However, once again, were this Court otherwise in doubt as to the propriety of denying defendants' motions for summary judgment as to the first count at this time, it would do so on such basis alone inasmuch as "the factual issue of due diligence in-

nose to the source." *Baumel v. Rosen, supra,* 412 F.2d at 574. Thus, the first indication which plaintiffs had that they might have been taken was the public announcement of the APL merger on September 12, 1968. Immediately thereafter, several of plaintiffs contacted their former counsel, Herbert M. Brune and Harrison M. Robertson,[11] as to what, if any, action should be taken. At a subsequent meeting on September 17, 1968, it was recommended that a detective agency be employed to ascertain whether there had been any negotiations between the Polands and APL, or any other companies, prior to April 15, 1968. Acting on behalf of certain of the plaintiffs, Mr. Robertson subsequently wrote a letter to Inter-State Bureau of Investigation, Inc., requesting it to undertake such an investigation and stressing that "time is of the essence."

By February 17, 1969, it had been learned that the Polands had been negotiating with Cole National prior to selling out to APL and Inter-State was so informed, with a request that it attempt to ascertain whether such negotiations had been going on prior to April 15, 1968. As a result of ensuing investigative efforts, Mr. Brune was informed on April 15, 1969, that a letter had been obtained from Daniel Coven, a vice-president of Cole National, indicating that he had been scheduled to meet with Sidney Poland in Baltimore on April 1, 1968, but that meeting had been postponed because the latter was in Florida. The letter further indicated that Sidney Poland had met with Mr. Joseph Cole, the Chairman of the Board of Cole National, in Florida sometime between April 1 and April 19, 1968. However, it was not known whether that meeting had included any definite business discussions. Mr. Coven's first meeting with Sidney Poland was not until April 19, 1968. The letter finally indicated that Gordon Polley of Coenen & Co. in New York had been the go-between for the Polands and Cole National, although the date of his involvement was not known.

Mr. Polley was subsequently visited by a representative of Inter-State on April 23, 1969, in a further effort to ascertain whether actual negotiations had taken place prior to April 15, 1968. In a letter to Mr. Robertson dated April 25, 1969, Inter-State's investigator reported that although Mr. Polley had refused to be specific as to the dates of his negotiations on behalf of the Poland brothers, "his indication led me to believe that there was little doubt that this occurred at least during February, March, or April, 1968, and may have even started sooner." The investigator went on to state his opinion that Mr. Polley was "probably an essential key to the anticipated litigation," and he indicated that Mr. Polley was anticipating a further written request outlining the information desired.

In response to the above, Mr. Brune wrote Mr. Polley directly on April 30, 1969, setting forth the background for plaintiffs' desire to learn all the possible facts surrounding the existence and status of negotiations between the Polands and Cole National prior to April 15,

---

volves, to some extent at least, the state of mind of the person whose conduct is to be measured against this test . . . ." *Id.,* citing *Azalea Meats, Inc. v. Muscat,* 386 F. 2d 5, 10 (5th Cir. 1967). Thus, even though this Court might not have any additional information bearing on the issue of unreasonable delay and due diligence before it at the trial of this matter, its findings with respect thereto would be drawn under different circumstances.

11. Brune and Robertson, plaintiffs' counsel in the previous state court litigation, had been discharged after the closing of the Agreement of Sale and Settlement on April 15, 1968. Because of their prior experience with plaintiffs, Brune and Robertson were somewhat leery of undertaking representation on their behalf again, and although they served in an advisory position to some of the plaintiffs during the period from September 12, 1968, through June 16, 1969, it was not until the latter date that they entered into an agreement to represent plaintiffs in connection with the instant litigation.

1968, and requesting Mr. Polley's cooperation. Although Mr. Polley, apparently on the advice of counsel, subsequently declined to reveal any specific information as to the existence of negotiations prior to April 15, he indicated that had there been no such negotiations he would have said so and would not have bothered to contact counsel.

This information was passed along to Mr. Goodman by Mr. Brune on May 20, 1969. Mr. Goodman thereafter suggested that he would like to meet with Mr. Brune and Mr. Robertson within the next week or so to discuss whether a suit could or should be brought. In preparation for that meeting, which took place on May 29, 1969, Mr. Brune prepared a memorandum summarizing the evidence which had been accumulated up to that point and concluding that while there were strong indications that serious negotiations had been entered into prior to April 15, 1968, there was no positive proof of that and, furthermore, there was little likelihood of obtaining any further information confirming such negotiations without recourse to legal proceedings.

A further meeting between Mr. Brune and Mr. Robertson and the majority of plaintiffs herein was organized and held on June 16, 1969, the day before the special APL stockholders' meeting at which the revised APL-Poland agreements were to be voted on. At that meeting the evidence was again reviewed and counsel stated their opinion that sufficient facts existed upon which to base a suit and that further facts could be obtained via discovery procedures. That meeting resulted in an agreement for the employment of Mr. Brune and Mr. Robertson as counsel for the purpose of preparing and filing suit against the Polands and any other appropriate defendants. Such suit was actually filed less than two and one-half months later on August 27, 1969. Defendants were first given notice thereof by a letter dated August 25, 1969.

Defendants do not raise any issue of unreasonable delay or lack of due diligence with respect to the period prior to April 25, 1969, and indeed, on the basis of the evidence summarized above, this Court finds that there would be no basis for any such contention. However, defendants submit that "plaintiffs and their counsel were very sure that they had reasonable grounds to support legal action by April 25, 1969,"[12] and they contend that plaintiffs should have given notice of their decision to file suit and seek rescission at least prior to June 17, 1969, the date of the APL stockholders' meeting.

The problem with defendants' argument is that neither plaintiffs nor their counsel were "very sure" that they had sufficient grounds on which to base a suit as of April 25, 1969, nor does this Court feel that they had sufficiently followed up the scent to its source as of that date. Thus, while they knew that there had been negotiations between the Polands and Cole National during April-May, 1968, they had no concrete indication that there had been any negotiations prior to April 15, 1968. However, they knew that if such negotiations had occurred, Mr. Gordon Polley had been involved in them. Under such circumstances this Court feels that it was incumbent upon plaintiffs, in the exercise of reasonable diligence, to attempt to further follow-up by sending Mr. Polley the written explanation and request for information which he was expecting.

■ Although it is true that Mr. Brune's letter of April 30th did not have the desired result of producing specific details, and while it is true that plaintiffs did not have any more factual data in support of their claim when they filed it on August 27, 1969, than they had on April 30th, nevertheless plaintiffs' counsel's conversation with Mr. Polley pro-

---

12. *See* Reply Memorandum of Defendants in Support of Motion to Dismiss and for Summary Judgment at 3.

vided the direct assurance that such negotiations had, in fact, been underway. Thus, as of May 20, 1969, plaintiffs had followed the scent as close to the source as they were going to get, and while they still lacked full and complete knowledge of the alleged fraud, their quest had generally confirmed their suspicion. Thereafter it was incumbent upon them to make a decision as to their course of action with "reasonable dispatch." *Occidental Life Ins. Co. of North Carolina v. Pat Ryan & Associates, Inc., supra,* 496 F.2d at 1268; *Johns Hopkins University v. Hutton, supra,* 488 F.2d at 917; *Baumel v. Rosen, supra,* 412 F.2d at 574.

The question, therefore, is whether plaintiffs were guilty of unreasonable delay during the period from May 20, 1969 to August 27, 1969. Considering the number of plaintiffs involved and the time necessary for counsel to research legal authorities and draft and prepare the original complaint, this Court concludes that there was no unreasonable delay. *Cf. Johns Hopkins University v. Hutton,* 343 F. Supp. 245, 255–56 (D.Md.1972) (holding, *inter alia,* that 130 days was reasonable period for researching and drafting of complaint), *rev'd,* 488 F.2d 912 (4th Cir. 1973) (in jury case, issue of reasonable diligence should have been submitted to the jury), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 1623, 70 L.Ed.2d 118 (1974).

Certainly the situation prevailing in the instant case is far different from that in *Baumel v. Rosen, supra,* where the plaintiffs delayed some 18 months after the date on which the Court found that they were chargeable with "complete awareness" of all the facts underlying the defendants' knavery. *Id.,* 412 F.2d at 574. Here plaintiffs did not have complete knowledge of all the facts until well after suit was filed.

Finally, defendants contend that plaintiffs' delay in giving notice until after consummation of the APL transaction was deliberately contrived so as to enhance the value of their securities at the market risk of the defendants. Under the facts of this case the Court finds such an argument to be without merit. Thus, unlike the situation where securities are being traded over an organized exchange, there is no evidence in the instant case that plaintiffs' securities were fluctuating in value. *Compare Baumel v. Rosen, supra,* 412 F.2d at 474–75; *Myzel v. Fields, supra,* 386 F.2d at 740–41 n. 15. Moreover, there was never any doubt that the APL stockholders would approve the revised APL-Poland transactions at their June 17, 1969 meeting. Finally, there is little doubt but that defendants were never better off than when the APL transactions were consummated, and notwithstanding their current protestations to the contrary, it is highly unlikely that they would have been willing to take any action which might have jeopardized the deal, to which it might be noted they were contractually committed.

This Court, therefore, concludes that plaintiffs have established that they acted with reasonable diligence in asserting their right to rescind. Defendants' motion for partial summary judgment based on unreasonable delay is denied.

With respect to defendants' further contention that plaintiffs should be barred from any recovery whatsoever on grounds of laches, it is to be noted that "unreasonable" or "inexcusable" delay is an essential element of laches both under federal law, *Gardner v. Panama R.R.,* 342 U.S. 29, 30–31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951) (*per curiam*), *Tobacco Workers International Union, Local 317 v. Lorillard Corp.,* 448 F.2d 949, 958 (4th Cir. 1971), *Powell v. Zuckert,* 125 U.S.App.D.C. 55, 366 F.2d 634, 636 (1966), and under state law. *Salisbury Beauty Schools v. State Board of Cosmetologists,* 268 Md. 32, 63, 300 A.2d 367 (1973); *Lipsitz v. Parr,* 164 Md. 222, 226, 164 A. 743 (1933). Therefore, inasmuch as this Court has found that there was no unreasonable delay on the

part of plaintiffs, there can be no basis for applying laches.

 Moreover, this Court also feels that defendants have failed to establish the second essential element of laches, i. e., prejudice. *See Baumel v. Rosen*, 283 F.Supp. 128, 143–44 (D.Md. 1968), *aff'd*, 412 F.2d 571 (4th Cir. 1969), *cert. denied*, 396 U.S. 1037, 90 S. Ct. 688, 24 L.Ed.2d 681 (1970). Of course, it is true that after the consummation of the deal with APL the Polands were no longer in a position to alter or postpone the deal. However, defendants have not established to the satisfaction of this Court that they changed their position "in a way that would not have occurred if the plaintiff[s] had not delayed." *Tobacco Workers International Union, Local 317 v. Lorillard Corp., supra*, 448 F.2d at 958–59. Finally, defendants have failed to indicate how being denied "uncontrolled access" to the books and records of accounts of Imperial and the various Poland companies, which were turned over to APL, is in any way prejudicial to them. Thus, they have not alleged that they would not have access to those records or that any of those records are missing.

Inasmuch as this Court concludes that the two essential elements of laches are missing in the instant case, it need not decide whether the defense of laches would otherwise be available in an action at law under Rule 10b–5. *Compare Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 214 (9th Cir. 1962) (upholding availability of defense) *with Myzel v. Fields, supra,* 386 F.2d at 742 (holding laches not applicable in action at law tried to a jury); *cf. Tobacco and Allied Stocks, Inc. v. Transamerica Corp.*, 143 F.Supp. 323, 325–28 (D.Del.1956), *aff'd without consideration of the point*, 244 F.2d 902 (3rd Cir. 1957).

Defendants' motion for summary judgment as to the first count on the grounds of laches is denied.

## II. The Second Count

In the second count of the amended complaint, plaintiffs allege that under Maryland common law the Polands, as controlling stockholders, controlling directors and executive officers of both Imperial Packaging and Imperial Properties, stood in a confidential and fiduciary relationship not only to those companies but also to plaintiffs as minority stockholders therein. Thus, relying on the case of *MacGill v. MacGill*, 135 Md. 384, 109 A. 72 (1919), plaintiffs allege that the Polands, in negotiating with plaintiffs concerning the purchase of their securities, had a duty to fully disclose all of the material facts known to them concerning the actual condition of the two companies and the true value of plaintiffs' securities therein. Finally, it is alleged that the Polands violated that fiduciary duty by purchasing plaintiffs' securities, and simultaneously obtaining releases of the pending state court litigation, for a grossly inadequate consideration and by deliberately concealing the facts relating to the various ongoing negotiations concerning a possible sale of a part or all of the assets of the two companies. By way of relief under the second count, plaintiffs seek the same monetary damages prayed for under the first count, i. e., the difference between the fair value of all that they received under the settlement of April 15, 1968, and the fair value of what they would have received had there been no breach by the Polands of their duty to make a full and complete disclosure.

Defendants do not question the principle that directors and officers of a corporation are fiduciaries of that corporation, or that if they enter into a transaction with, or have dealings which affect, the corporation, the burden is on them to establish the fairness thereof. However, defendants contend that under Maryland law the fiduciary duty owed by directors or officers of a corporation is to the corporation itself and not to its individual stockholders. *See Waller v.*

*Waller*, 187 Md. 185, 194, 49 A.2d 449 (1946). Defendants submit that to the extent *MacGill v. MacGill, supra,* suggested a contrary result, it was implicitly overruled in Llewellyn v. Queen City Dairy, Inc., 187 Md. 49, 58–62, 48 A.2d 322 (1946). Defendants, therefore, contend that under Maryland law there is no fiduciary duty owed by a controlling stockholder-director to a minority stockholder with respect to his stock, and that the second count of the amended complaint should be dismissed for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12 (b)(6).

There is a conflict of authority as to whether a director or officer of a corporation, in purchasing shares from individual stockholders, has a duty to disclose any inside information not otherwise available which might affect the value of the stock. *See generally* N. Lattin, The Law of Corporations § 81, 295–99 (2nd ed. 1971); Annotation, *Duty of Officer or Director of Corporation Toward One from Whom He Purchases Stock,* 84 A.L.R. 615 (1933). The majority common law rule considers the purchase of stock by a director or officer as not being within the area of corporate business and, therefore, that there is no fiduciary duty owed to the individual stockholders. A few states, however, view the director as a *quasi* trustee and hold him to a duty of full disclosure. A number of states have taken a third position, following the lead of the Supreme Court in *Strong v. Repide,* 213 U.S. 419, 29 S.Ct. 521, 53 L. Ed. 853 (1909), holding that even though there might generally be no duty to disclose, there may be "special facts" or circumstances which will give rise to such a duty.

Citing *MacGill v. MacGill, supra,* plaintiffs contend that Maryland is one of the minority states imposing a fiduciary duty of disclosure on directors and officers. In the alternative, they assert that the facts of this case are closely analogous to those of *Strong v. Repide,*

*supra,* and, consequently, that a duty of disclosure should be imposed in this case even were it not otherwise applicable.

On its face, *MacGill v. MacGill, supra,* would appear to be strong authority for plaintiffs' position. That case involved a scheme by the controlling stockholders-directors of a company to induce the minority stockholders therein to convert their common stock into preferred stock. The controlling interests, however, failed to inform the minority stockholders that the company had become prosperous as a result of the war and that the common stock was worth considerably more than the preferred. The minority stockholders subsequently filed suit alleging that the defendants had wrongfully induced the complainants to transfer certain shares to them individually, and seeking a return of their stock and an accounting. In overruling a demurrer to the complaint, the Court of Appeals stated that the facts alleged came well within the principles set forth in *Cumberland Coal and Iron Co. v. Parish,* 42 Md. 598 (1875), holding that directors have an important fiduciary relationship to the corporation and to the stockholders.

However, although *MacGill v. MacGill, supra,* has never been explicitly overruled, its validity has since been seriously undermined. Thus, in *Llewellyn v. Queen City Dairy, Inc., supra,* 187 Md. at 58–61, 48 A.2d 322, the Court of Appeals squarely rejected the contention that Maryland had departed from the majority view set forth above:

Appellees contend that Maryland has not followed the general rule of law, supported by the authorities above, that a director does not act for a corporation where he buys for himself its stock from a stockholder, but that he acts in the matter as a *quasi* trustee and is bound to make a full disclosure. They rely chiefly upon the case of *Ross Transport v. Crothers,* [185 Md. 573], 45 A.2d 267. We do not agree that the authorities cited support the contention of appellees, as the cases they cite simply support the

proposition that "trustees cannot purchase at their own sale, and trustees, in this sense, include directors of corporations". This was stated by Chief Judge Marbury in the case of *Ross Transport v. Crothers, supra,* and nearly all of the cases cited on appellees' brief were quoted or cited by the Chief Judge in that opinion. This case does not involve a trustee purchasing at his own sale. . . .
[*Id.,* 187 Md. at 60, 48 A.2d at 327.]

The Court, therefore, held that in the absence of fraud or misrepresentation directors, as individuals, have the right to purchase stock from individual stockholders. The Court further held that where there was any fraud or misrepresentation, the individual stockholder had a remedy by way of an action in deceit. *Id.,* 187 Md. at 62, 48 A.2d 322.

Similarly, in *Ace Development Co. v. Harrison,* 196 Md. 357, 365–66, 76 A.2d 566, 570 (1950), the Court of Appeals stated that "[a] director or agent, not acting as such but in his private capacity, may, in good faith, buy stock of his corporation, and has a perfect right to do so, even though it may be said that the buying of the corporate stock by a director or agent would have some effect upon corporate affairs." Thus, the current status of the law in Maryland on this point is summed up in 6 M.L.E., Corporations § 207, at 293 (1960), as follows:

Generally an officer or director is not in a fiduciary relationship with an individual stockholder with respect to his stock, and, in the absence of actual fraud, the legality of the transaction is not affected by the failure of the purchaser to divulge information which he may have concerning the value of the shares of stock.

 Plaintiffs' contention that under Maryland common law a controlling shareholder or director stands in a fiduciary relationship to the individual minority shareholders with respect to their stock would, therefore, seem to be

without merit. *Cf. Waller v. Waller, supra,* 187 Md. at 194, 48 A.2d 322. Moreover, it does not appear that Maryland has ever adopted or followed the "special facts" doctrine enunciated in *Strong v. Repide, supra.*

Therefore, this Court will grant defendants' motion to dismiss the second count of the amended complaint. In so doing, however, the Court notes that plaintiffs still have their action in deceit for common law fraud and misrepresentation under the fourth count. Moreover, any of the relief which might have been obtained under the second count, were such count sustainable, is still available under the first count of the amended complaint.

### III. The Third Count

In the third count of the amended complaint, plaintiffs allege that the various misrepresentations and omissions by defendants in connection with their purchase of plaintiffs' securities constituted violations of section 13 of the Maryland Securities Act, Md.Ann.Code art. 32A, § 13, giving them a private right of action thereunder comparable to that recognized under Rule 10b–5. *See Superintendent of Insurance of State of New York v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971); *Speed v. Transamerica Corp.,* 71 F.Supp. 457 (D. Del.1947), 99 F.Supp. 808 (D.Del.1951); *Kardon v. National Gypsum Co.,* 69 F. Supp. 512 (E.D.Pa.1946).

Defendants, however, contend that the Maryland Securities Act does not recognize any such private right of action in favor of a *seller* of securities. Thus, they point out that the civil liabilities section of that Act, Md.Ann.Code art. 32A, § 34 (1971), speaks only in terms of the liability of a seller of securities and does not create any express right of action in favor of a defrauded seller of securities against the buyer thereof. Moreover, section 34(h) specifically provides that "this subtitle does not create any cause of action not specified in this

section . . . ." [13] Defendants therefore contend that the third count should be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ.P. 12(b)(6).

While recognizing that the Maryland Securities Act does not *expressly* create "any cause of action not specified," plaintiffs nevertheless contend that it is still an open question as to whether a private cause of action under section 13 should not be *implied* in favor of a defrauded seller.

Thus, they point out that section 13 is a nearly verbatim copy of Rule 10b–5. Consequently, they contend that it inherits the long line of judicial and administrative precedent developed thereunder, *see* Miller, *A Prospectus on the Maryland Securities Act,* 23 Md.L.Rev. 289, 294 (1963), including the recognition of an implied cause of action in favor of a defrauded seller as well as in favor of a defrauded buyer. *See* Brune, *Rule 10b–5 and the General Law as to Deceit in Securities Transactions in Maryland,* 33 Md.L.Rev. 129, 139–40 (1973).

The trouble with plaintiffs' argument is that it disregards the clear contrary intent of sections 13 and 34. Those sections, which were adopted nearly verbatim from sections 101 and 410 of the Uniform Securities Act, clearly differentiate between the rights accorded thereunder to defrauded buyers and sellers. *See* Draftsmen's Commentary to § 101, reproduced in L. Loss & E. Cowett, Blue Sky Law app. I, at 251–52 (1958).[14] Moreover, as the Notes of the Commissioners on Uniform State Laws make clear, those sections were specifically designed to avoid the development of an implied cause of the action thereunder in favor of a defrauded seller. Thus, the Commissioners' Note to section 410(h) [section 34(h) of the Maryland Securities Act] states as follows:

The mere presence of certain specific liability provisions in a statute is no assurance that other liabilities will not be implied by the courts under the doctrine which creates a common-law tort action for violation of certain criminal statutes. Restatement of Torts §§ 286–88. Notwithstanding the presence of several specific liability provisions in each of the several SEC statutes, *the federal courts have implied a civil cause of action by a defrauded seller against the buyer under SEC Rule X–10B–5.* See Loss, Securities Regulation (1951 with 1955 Supp.), pp. 1052–66. *The "but" clause in § 410(h) is designed to assure that no comparable development is based on violation of § 101 of this Act.* [9C U.L.A. at 140–41 (1957).] [Emphasis added.]

Inasmuch as the Maryland legislature certainly had the Commissioners' Notes and Draftsmen's Commentary before it during its deliberations on the adoption of sections 101 and 410, its nearly verbatim acceptance of those sec-

13. Section 34(h) of the Maryland Securities Act, Md.Ann.Code art. 32A, § 34(h) (1971), provides in full as follows:

(h) *Rights and remedies additional to others.*—The rights and remedies provided by this subtitle are in addition to any other rights or remedies that may exist at law or in equity, *but this subtitle does not create any cause of action not specified in this section* or § 16 (e). [Emphasis added.]

14. The rationale for this disparate treatment was set forth in the Draftsmen's Commentary to § 101 as follows:

. . . there is no clear need to create any *civil liability* against buyers as distinct from sellers. Although the lower federal courts have uniformly implied a civil cause of action against fraudulent buyers under the SEC rule, the federal courts when applying federal law do not have at their disposal all of the common-law and equitable remedies of deceit and rescission which are available to the state courts without benefit of statute.

As was noted in part II, *supra,* it is well established that a defrauded seller in Maryland has an action at law in deceit for any fraud or misrepresentation perpetrated on him. *See* Llewellyn v. Queen City Dairy, Inc., 187 Md. 49, 62, 48 A.2d 322 (1946). Thus, in the fourth count of the amended complaint plaintiffs have asserted a claim based on common law fraud.

tions must be deemed an expression of legislative intent against the development of an implied right of action on behalf of a defrauded seller. This Court, therefore, does not feel free to find such an implied right of action under section 13.

Furthermore, in light of the fact that the Court of Appeals of Maryland has not yet spoken to this issue, this Court feels that were it otherwise inclined to imply such a right of action, it would be necessary to certify the legal question raised to that Court under the Uniform Certification of Questions of Law Act, Md.Ann.Code, Cts. & Jud.Proc. §§ 12–601 to 12–609 (1974). Such a procedure would, of course, considerably delay the ultimate disposition of this case. And, in the view of this Court, such delay would be useless inasmuch as it is apparent that the third count is merely a parallel state law claim to the federal claim alleged in the first count. Everything which plaintiffs seek to recover by way of relief thereunder could be achieved under the first count. Moreover, there are no apparent specific procedural advantages which would accrue to plaintiffs by proceeding under the state statute.

Defendants' motion to dismiss the third count of the amended complaint is, therefore, granted.

## IV. The Fourth Count

In the fourth count of the amended complaint, plaintiffs allege that the various actions of defendants in connection with their purchase of plaintiffs' securities were conceived and carried out with the deliberate intent to defraud and deceive plaintiffs into selling their securities at a price considerably lower than their real value. Plaintiffs allege that under the circumstances such actions amounted to common law fraud, entitling them to recover not only compensatory damages but also punitive damages.

Defendants contend that under Maryland law this allegation of common law fraud is a new claim being asserted for the first time in the amended complaint. Thus, although they admit that the original complaint contained various allegations that their actions were "false and fraudulent in law," defendants point out that such allegations were made in the context of an equitable claim for rescission. Since punitive damages could not have been recovered in such an action under Maryland law, *see Superior Construction Co. v. Elmo,* 204 Md. 1, 16–26, 104 A.2d 581 (1954) (on reargument), defendants submit that the fourth count cannot be deemed to relate back to the original complaint. Consequently, they contend that it is barred by the Maryland three-year statute of limitations on actions for common law fraud, Md.Ann. Code, Cts. & Jud.Proc. § 5–101 (1974), *Baumel v. Rosen, supra,* 283 F.Supp. at 143. *See Cline v. Fountain Rock Lime and Brick Co.,* 214 Md. 251, 258, 134 A. 2d 304 (1957).

Alternatively, in a separate but somewhat related argument defendants contend that the fourth count should be dismissed because under Maryland's doctrine of election of remedies, *see Wolin v. Zenith Homes, Inc.,* 219 Md. 242, 250–51, 146 A.2d 197, *cert. denied,* 361 U.S. 831, 80 S.Ct. 81, 4 L.Ed.2d 73 (1959), plaintiffs' decision to disaffirm the agreement of sale and settlement and to seek rescission constituted a waiver of the right to seek punitive damages. *See Superior Construction Co. v. Elmo, supra.* Finally, defendants contend that the defense of estoppel is also available under Maryland law to bar plaintiffs from asserting the instant claim for punitive damages at such a late date.

The primary problem with defendants' arguments is that they are all based on the assumption that it is Maryland, and not federal law, which is to provide the basis for determining whether the instant claim should be deemed to relate back to the original complaint. In the federal courts, however, Rule 15(c) of the Federal Rules of Civil Procedure sets forth the applica-

ble standard governing the relation back of amendments. Thus, even in a diversity case where this Court would otherwise be required to apply the law of the State in which it is sitting, *Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), *Erie R. R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it is now settled that the Federal Rules are controlling over conflicting state laws unless the particular rule in question transgresses either the standards set forth in the Enabling Act, 28 U.S.C. § 2072, or the Constitution. *Hanna v. Plumer,* 380 U.S. 460, 469–74, 85 S.Ct. 1136, 1143–45, 14 L.Ed.2d 8 (1965).

 Defendants have not challenged the validity of Rule 15(c) in this action, nor is any basis for such a challenge apparent. Indeed, one court described Rule 15(c) as being "merely a concise statement of the law which was in existence at the time it was adopted." *Anderson v. Abbott,* 61 F.Supp. 888, 893 (W.D.Ky.1945); *cf. Bowles v. Pure Oil Co.,* 5 F.R.D. 300, 303–04 (E.D.Pa. 1946). Thus, this Court has no difficulty in upholding its validity. *See Scalise v. Beech Aircraft Corp.,* 47 F.R.D. 148, 151 (D.Del.1969); *Newman v. Freeman,* 262 F.Supp. 106, 112 (E.D.Pa.1966).

 Defendants, however, suggest that where this Court's jurisdiction over a claim is based on pendent jurisdiction rather than diversity, this Court should only provide plaintiffs with the same rights and remedies available to them in the appropriate state court, and that the Federal Rules should yield to state law when their application would lead to a different result. Defendants have not cited any authority in support of that position, and this Court believes that the better rule is that the Federal Rules are controlling. Thus, Fed.R.Civ.P. 1 provides that the Federal Rules shall "govern the procedure in the United States district courts *in all suits of a civil nature* whether cognizable as cases at law or in equity or in admiralty, with the exceptions stated in Rule 81 [which are not relevant here]." (Emphasis added.) Moreover, the outcome-determinative test of *Guaranty Trust Co., supra,* 326 U.S. at 109, 65 S.Ct. at 1470, 89 L.Ed 2079, was subsequently limited in *Byrd v. Blue Ridge Rural Electric Cooperative,* 356 U.S. 525, 536–38, 78 S.Ct. 893, 900–01, 2 L.Ed.2d 953 (1958), and in *Hanna v. Plumer, supra,* 380 U.S. at 466–67, 85 S.Ct. at 1141, 14 L.Ed.2d 8, and the interests of judicial administration which were deemed so important in those cases, *id.,* 380 U.S. at 469–74, 85 S. Ct. at 1143–45, 14 L.Ed.2d 8, *Byrd, supra,* 356 U.S. at 537–39, 78 S.Ct. at 901–02, 2 L.Ed.2d 953, are hardly any less compelling where this Court's jurisdiction is based on pendent jurisdiction. As the Fifth Circuit recently noted in *Welch v. Louisiana Power & Light Co.,* 466 F.2d 1344, 1346 (5th Cir. 1972) *(per curiam),* "application of state rules as to relation back would disrupt important federal policies favoring simplification and uniformity of pleading, and liberality of amendment." *See* 3 J. Moore, *supra,* ¶ 15.15[2], at 1023–24. Thus, in *Newman v. Freeman, supra,* 262 F.Supp. at 109–13, the Court held that Rule 15(c) was controlling over conflicting state law, and allowed a pendent state claim to relate back to the original complaint even though it would otherwise have been barred under the applicable state statute of limitations.

 This Court, therefore, holds that Rule 15(c) governs whether the instant claim will be deemed to relate back to the original complaint. *Scalise v. Beech Aircraft Corp., supra; Newman v. Freeman, supra;* 3 J. Moore, *supra,* ¶ 15.15[2], 1019–24; 6 C. Wright & A. Miller, Federal Practice & Procedure ¶ 1503, 530–36 (1971). The construction and application of Rule 15 is a matter of federal practice and procedure governed by federal law. *Welch v. Louisiana Power & Light Co., supra,* 466 F.2d at 1345; *Loudenslager v. Teeple,* 466 F.2d 249, 250 (3rd Cir. 1972); 3 J. Moore, *supra,* ¶ 15.15[2], at 1023.

In *Barthel v. Stamm,* 145 F.2d 487, 490 (5th Cir. 1944), *cert. denied,* 324 U.S. 878, 65 S.Ct. 1026, 89 L.Ed. 1430 (1945), the liberal spirit of the Federal Rules with respect to pleadings and the amendment thereof was captured as follows:

> The Rules of Civil Procedure have abandoned the term "cause of action" and substituted "claim", and they have abolished the old forms of action as separate measures of legal rights. A suit is now brought on a claim, stated in simple and untechnical language. The suit potentially involves the whole transaction which it identifies, and is intended to reach and settle the rights which arise out of the transaction. To this end, amendment is freely allowed.

Consistent with that spirit, and as an integral part of the overall scheme of the rules to have cases decided on their merits and not on technical niceties of pleading, 3 J. Moore, *supra,* ¶ 15.15[2], at 1023, Rule 15(c) provides in pertinent part as follows:

> (c) *Relation Back of Amendments.* Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. . . .

This rule "is based on the idea that a party who is notified of litigation concerning a given transaction or occurrence is entitled to no more protection from statutes of limitations than one who is informed of the precise legal description of the rights sought to be enforced." 3 J. Moore, *supra,* ¶ 15.15[2], at 1021. *Cf. United States v. Memphis Cotton Oil Co.,* 288 U.S. 62, 69, 53 S.Ct. 278, 281, 77 L.Ed. 619 (1933), citing *New York Central & H. R.R. v. Kinney,* 260 U.S. 340, 346, 43 S.Ct. 122, 123, 67 L.Ed. 294 (1922).

*Barthel v. Stamm, supra,* involved a claim based on an oral contract between plaintiff's decedent and the defendant. In allowing an amendment, which was otherwise barred by limitations, to allege a written agreement, the Court stated as follows:

> Limitation is suspended by the filing of a suit because the suit warns the defendant to collect and preserve his evidence in reference to it. When a suit is filed in a federal court under the Rules, the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be, and that the form of the action or the relief prayed or the law relied on will not be confined to their first statement. [*Id.,* 145 F.2d at 491.]

*Cf. Tiller v. Atlantic Coast Line R.R.,* 323 U.S. 574, 580–81, 65 S.Ct. 421, 424–25, 89 L.Ed. 465 (1945); *Benco Plastics, Inc. v. Westinghouse Electric Corp.,* 387 F.Supp. 772, 783 (E.D.Tenn. 1974), citing *United States v. Templeton,* 199 F.Supp. 179, 183 (E.D.Tenn. 1961).

■ The critical element in determining whether a claim relates back under Rule 15(c), therefore, is that of notice. *Williams v. United States,* 405 F.2d 234, 236–37 (5th Cir. 1968); *Brennan v. Tar Heel Home Supply, Inc.,* 62 F.R.D. 190, 194 (D.N.C. 1974); *Shuman v. Sherman,* 356 F.Supp. 911, 915 & n.13 (D.Md.1973); *Jackson v. Airways Parking Co.,* 297 F.Supp. 1366, 1382–83 (N.D. Ga.1969).

■■ In the instant case, it is fully evident that the common law fraud claim asserted in the fourth count of the amended complaint is based on the same transaction or occurrence set forth in the original complaint. Thus, both that claim and plaintiffs' Rule 10b–5 claim are based on the same underlying "operational facts." *Williams v. United States, supra,* 405 F.2d at 238. Moreover, while the original complaint did not expressly assert a claim based on common law fraud, there can be no doubt but that defendants were put on

notice that a claim was being asserted against them arising out of their actions in connection with their purchase of plaintiffs' securities. In fact, defendants even had notice of plaintiffs' general legal theory, for not only is an action based on Rule 10b–5 founded on a theory of false and fraudulent misrepresentation, but plaintiffs went even further in the second count of the original complaint to specifically allege in connection with defendants' violation of state law that their actions had been "false and fraudulent in law." [15]

The fact that the amended complaint reflects a change in plaintiffs' theory of recovery from equity to law does not itself create a new cause of action nor does it raise a bar to relation back under Rule 15(c). *Friederichsen v. Renard,* 247 U.S. 207, 38 S.Ct. 450, 62 L. Ed. 1075 (1918); *Oil Well Supply Co. v. First Nat. Bank of Winfield, Kan.,* 106 F.2d 399, 404 (10th Cir. 1939); *Bowles v. Tankar Gas, Inc.,* 5 F.R.D. 230, 233 (D.Minn.1946); 3 J. Moore, *supra,* ¶ 15.06, 842–43.[16] Therefore, the fourth count of the amended complaint will be deemed to relate back to the original complaint, and consequently it is not barred by limitations.

In connection with this conclusion, it should be noted that defendants have not asserted that they would be specifically prejudiced by such a holding. Of course, it is true that they might be prejudiced by the fact that the addition of the fourth count increases their potential ultimate liability in that it adds a claim for punitive damages. However, it is well settled that the fact that an amendment increases the amount of recovery sought has no bearing on the question of relation back. *Tabacalera Cubana, S.A. v. Faber, Coe & Gregg, Inc.,* 379 F.Supp. 772, 777 (S.D.N.Y. 1974). Thus, courts have frequently allowed an amendment adding a claim for punitive damages although such a claim would have been barred under state law. *See, e. g., Seifert v. Solem,* 387 F.2d 925, 929 (7th Cir. 1967); *Cavanagh v. Trans World Airlines, Inc.,* 183 F.Supp. 370, 371 (W.D.Pa.1960).

Moreover, while it is true that plaintiffs delayed some time before seeking to amend their complaint, such was not done with the purpose or intent of prejudicing defendants, and it is settled that delay in asserting an amendment is not in itself sufficient to bar relation back. *Hageman v. Signal L. P. Gas, Inc.,* 486 F.2d 479, 484 (6th Cir. 1973); *Middle Atlantic Utilities Co. v. S.M.W. Development Corp.,* 392 F.2d 380, 384–85 (2nd Cir. 1968).

This Court, therefore, finds that no prejudice will result to defendants from allowing plaintiffs' common law fraud claim to relate back to the original complaint. *See Williams v. United States, supra,* 405 F.2d at 236; *Wall v. Chesapeake & Ohio Ry.,* 339 F.2d 434 (4th Cir. 1964) *(per curiam); Brennan v. Tar Heel Home Supply, Inc., supra,* 62 F.R.D. at 194. Indeed, the

---

15. Complaint ¶ 42; *see* discussion *supra* at 670.

16. In this regard, it should be noted that Fed.R.Civ.P. 8(a) authorizes a party to plead for alternative forms of relief. Moreover, Fed.R.Civ.P. 54(c) provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." An amendment changing the amount, or nature, of the relief prayed for is, therefore, actually unnecessary. *See* Wendy v. McLean Trucking Co., 279 F.2d 958, 959 (2nd Cir. 1960) *(per curiam);* 6 C. Wright & A. Miller, Federal Practice & Procedure § 1497, at 493–95 (1971). Thus, under the Federal Rules "a party's misconception of the legal theory of his case does not work a forfeiture of his legal rights," New Amsterdam Casualty Co. v. Waller, 323 F.2d 20, 25 (4th Cir. 1963), *cert. denied,* 376 U.S. 963, 84 S. Ct. 1124, 11 L.Ed.2d 981 (1964), and the courts have frequently awarded equitable relief where damages were prayed for and vice versa. *See* 10 C. Wright & A. Miller, *supra,* § 2664, at 117–18 (1973), and cases cited therein at nn. 58–59; *cf.* Robinson v. Lorillard Corp., 444 F.2d 791, 802–03 (4th Cir.), *cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

only perceptible change which the addition of the fourth count would seem to have on the presentation of the case as a whole is that it would impose a heavier burden of proof on the plaintiffs. *See Carras v. Burns,* 516 F.2d 251, at 256 (4th Cir., decided May 6, 1975) (Section 10 and Rule 10b–5 have eliminated the need to prove common law intent to defraud); *Baumel v. Rosen, supra,* 283 F. Supp. at 139–40 (proof of common law fraud is not required to sustain a cause of action under Rule 10b–5).[17]

One final point with respect to plaintiffs' claim for punitive damages under the fourth count merits comment before moving on. Defendants have suggested that section 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb(a), creates a federal rule on damages for all securities cases that might be brought under that Act, whether based on federal or pendent jurisdiction. Thus, although common law remedies are expressly reserved under that section, they submit that common law damage rules permitting recovery in excess of actual damages have not been saved.[18]

■ Although *Schaefer v. First National Bank of Lincolnwood,* 326 F.Supp. 1186, 1193 (N.D.Ill.1970), *appeal dismissed,* 465 F.2d 234 (7th Cir. 1972) *(per curiam),* supports defendants' position, it represents, at best, a minority viewpoint. Indeed, it was subsequently rejected even within the same court. *See Burkhart v. Allson Realty Trust,* 363 F.Supp. 1286, 1290–92 (N.D.Ill.1973). Thus, the general rule today appears to be that while punitive damages are not recoverable in an action *solely* under Rule 10b–5, *see deHaas v. Empire Petroleum Co.,* 435 F.2d 1223, 1229–32 (10th Cir. 1970), *Baumel v. Rosen, supra,* 412 F.2d at 576 *(dictum), Green v. Wolf Corp.,* 406 F.2d 291, 302–03 (2nd Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), they may be awarded, if allowable under state law, when a state law violation is joined with the Rule 10b–5 claim. *Flaks v. Koegel,* 504 F.2d 702, 706–07 (2nd Cir. 1974); *Coffee v. Permian Corp.,* 474 F.2d 1040, 1044–45 (5th Cir.), *cert. denied,* 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973); *Young v. Taylor,* 466 F.2d 1329, 1337–38 (10th Cir. 1972); *Burkhart v. Allson Realty Trust, supra,* 363 F.Supp. at 1290–92; *In re Caesars Palace Securities Litigation,* 360 F.Supp. 366, 393–94 (S.D.N.Y.1973); *Gann v. Bernzomatic Corp.,* 262 F.Supp. 301, 304 (S.D.N.Y.1966).

■ In Maryland it is settled that punitive or exemplary damages may be recovered in an action for common law fraud or deceit, but only "where the wrong involves some violation of duty springing from a relation of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly indicating malice and wilfullness and calling for an extension of the doctrine." *Fowler v. Benton,* 245 Md. 540, 552–53, 226 A.2d 556, 564, *cert. denied,* 389 U.S. 851, 88 S.Ct. 42, 19 L.Ed.2d 119 (1967), citing *Russell v. Stoops,* 106 Md. 138,

17. In Maryland it is settled that proof of fraud in a civil action, either in law or in equity, must be "clear and convincing." *See* Peurifoy v. Congressional Motors, Inc., 254 Md. 501, 517, 255 A.2d 332 (1969); Rent-A-Car Co. v. Globe & Rutgers Fire Ins. Co., 161 Md. 249, 267–68, 156 A. 847 (1931); Loyola Federal Savings & Loan Association v. Trenchcraft, Inc., 17 Md.App. 646, 655–59, 303 A.2d 432 (1973). For a discussion of the elements of common law fraud in Maryland, *see* Casale v. Dooner Laboratories, Inc., 503 F.2d 303, 306 (4th Cir. 1973), James v. Goldberg, 256 Md. 520, 528–29, 261 A.2d 753 (1970), Suburban Properties Management, Inc. v. Johnson, 236 Md. 455, 460, 204 A.2d 326 (1964).

18. Although the Fourth Circuit was recently confronted with this issue in Carras v. Burns, 516 F.2d 251 (4th Cir., decided May 6, 1975), it found it unnecessary to decide in that case whether the federal policy should control the district court's decision to try a pendent claim for punitive damages under state law inasmuch as the jury had found that the defendants had lacked the common law intent to defraud necessary to support the claim for punitive damages. *See* 516 F. 2d at 259–60.

143–44, 66 A. 698 (1907) ; *Loyola Federal Savings & Loan Association v. Trench-craft, Inc.*, 17 Md.App. 646, 663, 303 A. 2d 432 (1973).

■ Of course, at the present stage of the proceedings it would be inappropriate for this Court to comment as to whether plaintiffs can make a sufficient showing to justify an award of punitive damages under the facts of this case. However, it would appear that they have at least alleged sufficient facts to withstand a motion to dismiss.

Defendants' motion to dismiss the fourth count of the amended complaint is denied.

### V. The Derivative Suit Claims

During the course of the briefing and oral argument on defendants' Motion to Dismiss and for Summary Judgment, considerable attention has been focused on the so-called derivative suit claims and the role, if any, which they are to play in the ultimate determination of damages, assuming, of course, that plaintiffs are successful in establishing liability. As has been previously noted, in their original complaint plaintiffs expressly disavowed any intent to have this Court go into those claims in determining the respective values of the Poland companies and Imperial.[19] Now, however, they contend that as part of their damages under the first count of the amended complaint they are entitled to offer proof as to the value of those claims and to recover the value of their portion of the derivative suit.

■ Defendants oppose any attempt by plaintiffs to litigate the derivative suit claims in this Court either directly or as an element of damages. Thus, they contend that those claims, representing injuries to the corporation, could only be asserted by, or on behalf of, Imperial itself and that plaintiffs as former stockholders therein have no past or present individual proprietary interest sufficient to entitle them either to litigate those claims or to recover any damages on account thereof in their individual capacities. Moreover, defendants contend that any attempt to litigate the claims arising out of the alleged wrongful commission arrangement or the alleged appropriation of the corporate opportunity relating to bag manufacturing would be barred by the res judicata effect of the dismissal with prejudice of the prior derivative suit in the state court.[20]

■ There can be no doubt but that the derivative suit claims represent injuries to Imperial Packaging which affected the plaintiffs in this action only indirectly thru their status as stockholders. Moreover, it is well established in Maryland that a stockholder cannot sue individually to recover damages for injuries to the corporation, even though the directors may have entered into an unlawful conspiracy for the specific purpose of ruining the corporation. *Waller*

---

19. *See* discussion *supra* at 669–670.

20. Defendants have also asserted a number of additional grounds, based on theories of pendent jurisdiction and limitations, as to why this Court should not allow plaintiffs to litigate the derivative suit claims in this action. With one exception, this Court finds those arguments without merit since the derivative suit claims arise in this case not as a separate cause of action over which this Court would have pendent jurisdiction, but rather as an element of damages directly under a federal cause of action. Defendant's assertion of limitations has merit, however, insofar as it touches upon the claim arising out of the alleged wrongful management fee. Unlike the other derivative suit claims, that claim was never asserted prior to the filing of the amended complaint, either in the state court derivative suit or in the original complaint in this action. Since the facts upon which it is based are separate and distinct from those underlying the other claims, it cannot be deemed to relate back to the original complaint under Fed.R.Civ.P. 15(c). Therefore, since any cause of action based thereon accrued during the period from 1965 to 1968, the claim is now barred by Maryland's three-year statute of limitation on civil actions. Md.Ann.Code, Cts. & Jud.Proc. § 5–101 (1974).

*v. Waller, supra,* 187 Md. at 189–91, 49 A.2d 449. Thus, any cause of action on account of those injuries would normally have to be brought in the name of the corporation. In an appropriate case, however, the individual stockholders have the right, and will be allowed, to bring a derivative action on behalf of, and for the benefit of, the corporation. *Id.,* at 191–92, 49 A.2d 449.

In the instant case, certain of the plaintiffs exercised that right by filing a derivative suit in the Circuit Court of Baltimore City. However, as an integral part of the sale and settlement of April 15, 1968, they surrendered their right to continue to prosecute that action by agreeing to procure its dismissal with prejudice.

■ ■ Defendants contend that such dismissal stands as a bar to plaintiffs in this case. However, it is well established that a federal court may void a state court decree or judgment which was obtained by extrinsic or collateral fraud. *United States v. Throckmorton,* 98 U.S. 61, 64–68, 25 L.Ed. 93, 95–96 (1878); *Diehl v. United States,* 438 F. 2d 705, 709 (5th Cir.), *cert. denied,* 404 U.S. 830, 92 S.Ct. 67, 30 L.Ed.2d 59 (1971); *Aetna Casualty & Surety Co. v. Abbott,* 130 F.2d 40, 43–44 (4th Cir. 1942); *cf. Wohl v. Keene,* 476 F.2d 171 (4th Cir. 1973). Alternatively, the plaintiff can choose to let the judgment stand and sue instead for damages for the fraud that led him to give up his original cause of action. *See Maicobo Investment Corp. v. Von Der Heide,* 243 F.Supp. 885, 893 (D.Md.1965).

■ In the instant case, plaintiffs have elected to affirm the sale and settlement of April 15, 1968, and to sue for damages.[21] Inasmuch as the judgment of dismissal of the state court suit was an integral part of that settlement, it also must be affirmed since a single part of a single agreement cannot be rescinded alone. *See Security Underground Storage, Inc. v. Anderson,* 347 F.2d 964, 967–68 (10th Cir. 1965). Indeed, plaintiffs have conceded as much and they submit that their current claim is solely one for damages for the fraud that led them to give up their right to maintain the state court derivative suit.[22]

The question, therefore, is the measure of those damages. Certainly it would not be the value of the derivative suit claims themselves, or plaintiffs' portion thereof, inasmuch as that value could not be determined without actually litigating the claims, the very alternative which plaintiffs have conceded that they surrendered. Moreover, as has been previously noted, in Maryland the individual present or former stockholder has no right to recover damages in his individual capacity for wrongs done to the corporation. *See Armstrong v.*

---

21. Although plaintiffs assert that they are now seeking solely to recover money damages at law, they still request as part of their prayer for relief under the amended complaint that this Court declare that the Agreement of Sale and Settlement of April 15, 1968, is void under section 29(b) of the Securities Exchange Act. However, while the language of that section speaks in absolute terms, the courts have interpreted it as merely rendering the contract voidable at the option of the innocent party. *See* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 387–88, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970). Thus, in Occidental Life Ins. Co. of North Carolina v. Pat Ryan & Associates, Inc., 496 F.2d 1255, 1265–67 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974), the Fourth Circuit stated that section 29(b) should be viewed merely as an adjunct to the other remedies provided under the securities laws and it refused to nullify a contract which had already been executed where the illegality under the securities laws was merely collateral to the agreement to sell the stock and where the parties had other remedies at their disposal which would produce an equitable result. Inasmuch as plaintiffs in the instant case have elected not to rescind the Agreement of Sale and Settlement, this Court sees no reason why it should declare the Agreement void under section 29. Plaintiffs have a fully adequate remedy at law.

22. *See* Second Memorandum of Plaintiffs in Opposition to Defendants' Motion to Dismiss and for Summary Judgment at 27–28.

*Frostie Co.,* 453 F.2d 914, 917 (4th Cir. 1971); *Waller v. Waller, supra,* 187 Md. at 189–91, 49 A.2d 449.

This Court, therefore, holds that the appropriate measure of damages would be the same as that applicable to plaintiffs' claim under Rule 10b–5, *i. e.,* the difference between what plaintiffs actually received therefor and what they would have received had there been no fraudulent conduct on the part of the defendants. *See Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 411–12 (3rd Cir. 1973); *Baumel v. Rosen, supra,* 412 F.2d at 575; *Myzel v. Fields, supra,* 386 F.2d at 744–49; *Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965).

Thus, if plaintiffs can establish that they would have received a greater value for their surrender of their right to prosecute the state court derivative suit had there been no fraudulent conduct on the part of the defendants than they received under the Agreement of Sale and Settlement of April 15, 1968, they would be entitled to recover the difference as part of their damages under the first count, assuming, of course, that they can establish liability. Plaintiffs will not, however, be allowed to litigate the derivative suit claims in this Court. That is not, of course, to say that plaintiffs cannot challenge the 78 percent-22 percent allocation of the APL consideration between the Poland companies and Imperial on some other basis.

## VI. Termination of the Duty to Disclose

Finally, both plaintiffs and defendants have requested this Court to issue a partial summary judgment determining the date on which the defendants' duty to disclose any material facts in connection with their purchase of plaintiffs' securities terminated. Such a preliminary determination would serve to substantially narrow the issues between the parties and to expedite the trial of this matter. Inasmuch as the Court finds that there is no dispute as to any of the material facts relating to that issue, or as to any inferences which might be drawn therefrom, it is appropriate for summary judgment at this time. *See Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co., supra,* 381 F.2d at 249; *Molinaro v. Watkins-Johnson CEI Division, supra,* 359 F. Supp. at 469.

The undisputed relevant facts are that on February 28, 1968, the Polands entered into an oral agreement with Dr. Nachlas and Mr. Edelson to purchase their combined unit of Imperial securities for $27,500 on the express condition that the Polands could acquire five additional units, and on the further condition that if they bought the other units at a higher price, they would pay Dr. Nachlas and Mr. Edelson an equal amount. That agreement was confirmed in writing on March 1, 1968, by a letter to Dr. Nachlas and Mr. Edelson from Weinberg & Green, counsel for Imperial and Poland Brothers, Inc. On March 3 and 4, 1968, the Polands entered into similar oral agreements with Dr. Lister and Mr. Levinson respectively to purchase their units.

Finally, at the meeting at Norman Goodman's house on March 5, 1968, the Polands entered into a general oral agreement with a majority of the remaining dissident stockholders to purchase their shares for $29,000 per unit. In addition, the Polands agreed to pay the dissident stockholders an extra $30,000 to cover their legal fees incurred in connection with the then pending state court litigation, which was to be dismissed with prejudice as part of the overall settlement. That agreement, however, was expressly conditioned upon all of the dissident minority stockholders agreeing to sell their securities. The specific terms and language of the final

agreement were to be worked out between counsel.

By March 12, 1968, a general agreement had been reached by counsel as to the terms of the settlement. In a letter of that date, defendants' counsel again emphasized that the purchase was contingent upon the sale and delivery of all 14 units. After going through five drafts, counsel finally reached agreement on the language actually incorporated into the written "Agreement, Mutual Release, and Contract of Sale and Purchase," dated March 15, 1968. That. Agreement provided that it would be binding on all the parties "as soon as counterparts have been signed by the Corporation, all of the majority stockholders and all the minority stockholders." Although the Polands signed the Agreement on March 15, 1968, it was not signed by all of the plaintiffs herein until March 25, 1968. Pursuant to the terms of the Agreement, settlement was held on April 15, 1968, and at that time the signed agreements were exchanged and the securities delivered against payment.

Citing *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 890–91 (2nd Cir. 1972), defendants contend that their duty to disclose any material facts terminated with respect to the various plaintiffs as of the respective dates on which they entered into firm oral agreements to purchase their securities. Thus, they contend that their. duty to disclose terminated on March 1, 1968, with respect to Dr. Nachlas and Mr. Edelson, on March 3, 1968, with respect to Dr. Lister, on March 4, 1968, with respect to Mr. Levinson, and on March 5, 1968, with respect to the remaining plaintiffs. In the alternative, defendants assert that their duty to disclose terminated on March 12, 1968, the date by which all the essential terms of the final agreement had been worked out between counsel. Finally, they contend that the latest possible date for termination of their duty to disclose was March 25, 1968, the date by which all parties had signed the formal written Agreement.

Plaintiffs, on the other hand, contend that the duty to disclose any material facts should be deemed to have continued right up to settlement on April 15, 1968. Thus, they contend that *Radiation Dynamics, supra,* is not controlling in this case inasmuch as it did not involve a situation where the defendants were in a fiduciary relationship to the plaintiffs or where there were "special facts" imposing a duty to disclose. In the alternative, they contend that the earliest possible date on which the duty to disclose should be deemed to have terminated was March 25, 1968.

Notwithstanding plaintiffs' arguments to the contrary, this Court finds the reasoning of *Radiation Dynamics, supra,* persuasive and controlling in this case. In that case the trial judge had instructed the jury that the date at which materiality was to be determined was "the date when an insider has committed himself to purchase the stock." On appeal, Radiation Dynamics contended that the proper date should have been the later date on which the securities had been actually transferred and paid for. In rejecting that argument, the Second Circuit stated as follows:

> The essential purpose of Rule 10b–5, as we have stated time and again, is to prevent corporate insiders and their tippees from taking unfair advantage of the uninformed outsiders. SEC v. Texas Gulf Sulphur, [401 F.2d 833 (2nd Cir.), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968)]; List v. Fashion Park, [340 F.2d 457 (2nd Cir.), cert denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L. Ed.2d 60 (1965)]; Kohler v. Kohler Co., 319 F.2d 634 (7 Cir. 1963). It was not intended to provide an escape hatch through which disgruntled buyers or sellers could avoid transactions to which they had become committed,

but which had not been fully consummated by the formal exchange of the money or the securities agreed upon to be exchanged.

It was to effectuate the purpose of the Rule that we stated in SEC v. Texas Gulf Sulphur, *supra*, 401 F.2d at 853 n. 17, "that the time that an insider places an order, rather than the time of its ultimate execution, be determinative for Rule 10b–5 purposes." See Ryan v. J. Walter Thompson Company, 453 F.2d 444, 447 (2 Cir. 1971); Fershtman v. Schectman, 450 F.2d 1357, 1360 (2 Cir. 1971). In keeping with such purposes, we hold that Judge Pollack correctly instructed the jury when he stated that the time of a "purchase or sale" of securities within the meaning of Rule 10b–5 is to be determined as the time when the parties to the transaction are committed to one another. [*Id.*, 464 F.2d at 890–91.]

Although not having to decide the issue inasmuch as the evidence had established nondisclosure of material facts even prior to the date at which the parties had become committed to one another, the Court in *Rochez Bros., Inc. v. Rhoades*, 353 F.Supp. 795, 801–02 (W.D. Pa.), *aff'd as to liability*, 491 F.2d 402 (3rd Cir. 1973), stated that it would be inclined to follow *Radiation Dynamics, supra*, were it necessary to decide the issue:

> While it is true that Rule 10b–5 speaks broadly of fraud "in connection with" the purchase or sale of any security, and events even after the date of transfer of the certificates might well be relevant to demonstrate fraud in the transaction, . . . it seems common sense to treat the binding commitment to sell with some degree of finality. [*Id.*, 353 F.Supp. at 802.]

Plaintiffs have failed to provide any rationale in support of their argument that the binding commitment to sell should be treated with any less finality merely because of the existence of a fiduciary relationship or of "special facts," even were such found to exist.

██ The question, therefore, is to determine the date as of which all the parties were committed to one another. While it is true that the Polands had entered into oral agreements with certain of the plaintiffs herein, those agreements were contingent upon a certain number, or upon all, of the dissident minority stockholders agreeing to sell their securities. That condition was repeatedly emphasized by the Polands, and the written Agreement of March 15, 1968 itself provided that it would not be binding until *all* the minority stockholders had signed. This Court, therefore, finds that the parties were not committed to one another until March 25, 1968, when all of the dissident minority stockholders had signed the written Agreement of Purchase and Sale. That date marks the termination of the defendants' duty to disclose any material facts, although evidence of events after that date might well be relevant to showing nondisclosure or fraud with respect to events before that date. *See Strong v. Repide, supra*, 213 U.S. at 433, 29 S.Ct. at 526; *Rochez Bros., Inc. v. Rhoades, supra*, 353 F.Supp. at 802 & n.20.

## CONCLUSION

Counsel for plaintiffs are directed to draw an appropriate Order in accordance with this Opinion, and to submit the same within two weeks from the date of this Opinion.